521 So.2d 515 (1988)
John Frank LABRUZZO
v.
EMPLOYERS INSURANCE OF WAUSAU, et al.
No. CA-8122.
Court of Appeal of Louisiana, Fourth Circuit.
February 10, 1988.
Rehearing Denied March 16, 1988.
Writ Denied May 6, 1988.
*517 C.T. Williams, Jr., George R. Blue, Jr., Donald A. Hammett, Blue, Williams & Buckley, Metairie, for defendant-appellant, Chicago Ins. Co.
Eldon E. Fallon, J. Robert Ates, Kierr, Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, for plaintiff-appellee, John Frank Labruzzo.
Before BYRNES, WARD and WILLIAMS, JJ.
WARD, Judge.
In this tort suit both plaintiff and defendant insurer appeal a judgment in favor of the plaintiff for injuries he sustained in an accident which occurred on property owned by the defendant's insured. In its suspensive appeal, Chicago Insurance Company, insurer of Jackson Square Investments Limited (JSIL), raises issues of liability and damages; the plaintiff John F. Labruzzo appeals the damage award.
Labruzzo sued JSIL along with its primary insurance carrier, Employers Insurance of Wausau which provided $500,000.00 of coverage, and Chicago Insurance Company, the excess carrier. North River Insurance Company, worker's compensation insurer for Labruzzo's payroll employer, intervened to recover compensation paid to Labruzzo. Shortly before trial, Employers of Wausau, the primary carrier, settled with Labruzzo and with North River, the intervening compensation carrier. The settlement paid Labruzzo $450,000.00, of which $50,000.00 was to be paid to North River in exchange for the dismissal of its intervention. Labruzzo released Employers of Wausau. He reserved his rights against JSIL only to the extent of its excess coverage under the Chicago policy; however, he agreed to allow Chicago a credit of $500,000.00, plus interest, against any amount for which Chicago might be found liable.
The case was assigned to a Commissioner of the Civil District Court who recommended judgment against Chicago, the sole remaining defendant. The Trial Court rendered judgment for Labruzzo and against Chicago for a total of $1,071,341.21, plus costs and interest, subject to the stipulated credit of $500,000.00. Chicago's motion for a new trial was denied, and these appeals followed.

LIABILITY
Chicago Insurance asserts three theories in support of the argument that Labruzzo's exclusive remedy against JSIL is worker's compensation and argues in the alternative that even if Labruzzo has a tort claim, his recovery should be barred or reduced by victim fault. These issues of liability require a consideration of the following pertinent facts from the record.
JSIL was formed in January of 1982 for the purpose of purchasing and holding title to a large parcel of real estate on the Mississippi River's edge of the French Quarter. The parcel, purchased from American Can Company, had formerly been the site of the Jax Beer brewery and consisted of several dilapidated buildings. JSIL was a Louisiana limited partnership. Its general partner was Jackson Square Investments Corporation which was owned in equal shares by Darrell Berger, David Burrus and Wayne Ducote. Berger and Burrus were members of the corporation's board of directors, and they and seven other individuals were the limited partners of JSIL.
Berger and Burrus had been partners in the real estate business for a number of years. They engaged in a variety of projects and ventures, most frequently buying a piece of property and improving it in some way for quick resale. For tax and liability purposes Berger and Burrus formed many limited partnerships, similar to JSIL, with corporate general partners. Usually, a separate partnership was formed for each large project. Few of the limited partnerships had a payroll; personnel were provided by outside contractors or from a core group of employees, including Labruzzo, who were payroll employees of Berger & Burrus Investments (BBI), an ordinary partnership owned by Darrell Berger and David Burrus.
*518 John Labruzzo had worked for Darrell Berger and David Burrus since 1977. Up until August of 1982, Labruzzo's primary responsibility had been the management of Delta Towers, a downtown New Orleans apartment building containing more than 1000 units which was owned by one of the limited partnerships. Labruzzo's job at Delta Towers was the day-to-day operation of the building including physical maintenance, much of it performed by Labruzzo himself.
In August of 1982, Berger and Burrus withdrew from the management of Delta Towers, and moved their offices to Iberville Street, a few blocks from the Jax property. Labruzzo's job duties during this period were varied. He did not have a specific major area of responsibility, but worked on several projects including planning the move of all Berger and Burrus offices onto the Jax property and, perhaps, some coordination of cleanup and demolition on the premises. Additionally, Labruzzo took on an outside job as general contractor for the new owners of the Delta Towers who were converting the building to a Ramada hotel.
The extent of Labruzzo's participation in the Jax Brewery project has been a major issue in this lawsuit. Berger and Burrus and several of their key employees who worked with Labruzzo and knew him well claim that Labruzzo was not to be included in the Jax development, due to a consensus of opinion that his abilities were not appropriate for the project. Labruzzo corroborated the fact that he had been "left out" of the Jax project, although he did not know why until he heard the trial testimony of his employers and co-workers.
Because JSIL had no payroll employees, several BBI employees initially participated in the planning of the Jax development and in demolition and cleanup on the property. In 1983, after Labruzzo's accident, Jackson Square Development Corporation was formed, and it hired employees for the project. However, as long as BBI employees were used, JSIL reimbursed BBI for their time and expenses incurred on the Jax project. Although Labruzzo may have been tangentially involved in the early stages of the Jax project, he was not among the BBI employees whose salary was reimbursed by JSIL.
The facts immediately surrounding Labruzzo's accident are for the most part undisputed. Labruzzo had spent the morning of January 11, 1983 in Baton Rouge at a hearing on a controversy involving some contractors. He returned to his office shortly before noon. Soon afterwards, David Burrus asked Labruzzo to go with him to the Jax property. The purpose of Labruzzo's accompanying Burrus is disputed. Chicago contends that Labruzzo was to show the property to Burrus. Labruzzo testified that Burrus asked him, "Come on. Take a walk with me. Let me go see what I bought." David Burrus testified,
I had never been in the buildings that constituted the brew house. Our office was a couple of blocks from there at 111 Iberville, and one day around noon I literally wanted to go over there and see what we were doing because there were decisions being made that I had to make essentially, and I literally stuck my head in Johnny's office door and asked, "What are you doing" He said, "Nothing." I said, "Let's take a walk over to the brewery." And we got in his car and drove there. He said, "Let's go to lunch later", I think. And we parked on Decatur Street and walked in the brewery.
The work on the brewery was in the very early stages, and the premises were still in a dilapidated condition. Burrus and Labruzzo walked through the brewery buildings for fifteen to twenty minutes, discussing the contractors' hearing. At the far end of the property in the largest building, the brew house, the two men reached an iron stairway leading from the second floor to the first. Labruzzo preceded Burrus down the stairway. As he reached the second or third tread, and before Burrus stepped down onto the stairs, the section of the stairway on which Labruzzo was standing gave way. Labruzzo plummeted to the ground floor, 27 feet below. Unable to use the broken stairway, Burrus scrambled through the building to find another way *519 down, calling as he ran to a crew of men working in the building. The men found Labruzzo conscious and although unable to speak, indicating that his left leg had been injured. After cutting through a barred doorway with a blowtorch, the men placed Labruzzo in his car, and Burrus drove him to a hospital emergency room.

Exclusive Remedy Defenses
On appeal, Chicago first contends that Labruzzo's sole legal remedy against JSIL is under the Louisiana worker's compensation system. In support of this contention, Chicago makes three related arguments: (1) JSIL was the statutory employer of Labruzzo; (2) JSIL and BBI were Labruzzo's joint employers; or (3) Labruzzo was a "borrowed servant" of JSIL.
The Louisiana worker's compensation statute provides that when any business, defined in the statute as a principal, uses a contractor to perform work which is a part of the principal's trade, business or occupation, the principal is liable for compensation due an employee of the contractor who is injured while employed in that work. La. R.S. 23:1061. Such a principal is known as a statutory employer. As is the case with regular employers, worker's compensation is the exclusive remedy a contractor's injured employee has against a principal who is his statutory employer. La.R.S. 23:1032.
Chicago contends that JSIL was using BBI to perform work on its business, the brewery project, and hence as a principal JSIL has immunity against a tort suit by Labruzzo, a BBI employee injured while inspecting the brewery. This contention is not persuasive. Although there is evidence to the contrary, we find no manifest error in the Trial Judge's adoption of the Commissioner's finding that Labruzzo had no role in the Jax development project. Having affirmed finding, we believe that although JSIL used some BBI employees in the Jax project, that does not mean that JSIL was the statutory employer of all BBI employees, regardless of whether they worked on the brewery or not. JSIL may have been a principal as to other BBI employees who were working on the brewery project, but merely because Labruzzo was injured while visiting the brew house does not confer immunity upon JSIL against the tort claim of Labruzzo, a BBI employee working on other BBI projects unrelated to the brewery. We therefore reject Chicago's statutory employer argument.
A related argument is that Labruzzo was an employee of both BBI and JSIL as joint employers, and they therefore are solidarily liable to him for worker's compensation which is his exclusive remedy against both entities. Chicago makes several persuasive arguments that the evidence supports a finding that BBI and JSIL were engaged in the Jax development project as a joint enterprise. Even assuming a joint enterprise, however, application of the joint employer doctrine must be based upon a finding that Labruzzo had been performing work for the benefit of both BBI and JSIL. Babineaux v. Southeastern Drilling Corp., 170 So.2d 518, 529 (La.App. 3d Cir.), writ refused, 247 La. 613, 172 So.2d 700 (1965). That is, like the statutory employer rule, the joint employer doctrine applies only if Labruzzo was working on the Jax project. Because there is no manifest error in the Trial Court's finding that Labruzzo was not working on the brewery project, the joint employer doctrine, like the statutory employer rule, does not apply.
Under the borrowed servant theory, Chicago contends that JSIL is immune from tort liability to Labruzzo because JSIL had borrowed Labruzzo from BBI. We reject this theory, because as stated above, the record supports the finding that Labruzzo was neither doing the work of JSIL nor under the control of JSIL at the time he was injured.

Victim Fault
Labruzzo's suit pleads both strict liability and negligence. Under either theory, Chicago contends that Labruzzo was the victim of his own fault and that he therefore should be barred from recovery or his damages should be reduced by the percentage of his fault. The Commissioner found that *520 Labruzzo was not at fault; the Trial Court adopted that finding. Chicago argues that the facts show that Labruzzo was fully aware of the danger and that he voluntarily exposed himself to it.
Labruzzo testified that he had never been in the brew house before the day of the accident. Several disinterested witnesses, however, testified that they had seen Labruzzo in the brew house on occasions prior to the accident. One witness even stated that when Labruzzo showed him through the building two months before the accident, Labruzzo cautioned him about the decrepit condition of the iron stairs.
Nonetheless, even if we were to accept the evidence that Labruzzo was familiar with the condition of the brew house stairway, it would not require the conclusion that he voluntarily exposed himself to the risk that the stairs would collapse. Several witnesses, including David Burrus who was about to descend the stairs when they suddenly gave way and Steven Bingler, the project architect, who had previously used the stairs, testified that there was nothing about the stairway which would cause a person to expect its imminent collapse.
Chicago analogizes Labruzzo's lack of care to that of the plaintiff in Stewart v. Sam Wallace Industrial Co., 409 So.2d 335 (La.App. 1st Cir.1981), writs denied 413 So.2d 497 (La.1982), who failed to discover a fence post hole which was overgrown with weeds. The Stewart plaintiff, however, should have suspected there might be a hole in his path, and he could have checked the area before traversing it. Therefore, he was found negligent. In contrast, the brew house stairway appeared sound and there was no practical way for Labruzzo to check the stairway before stepping onto it to determine whether it would bear his weight. Accordingly, there is no error in the finding that Labruzzo did not cause his own injury.

DAMAGES
After considering evidence including the expert testimony of physicians and economists supported by documentary exhibits, the Commissioner recommended, and the Trial Judge rendered, awards of $76,341.21 for the stipulated past medical expenses and $45,000.00 for future medical expenses. The Trial Judge found the Commissioner's assessment of other damages inadequate. He calculated and rendered judgment for Labruzzo's "diminished earning capacity," which includes lost past and future income, in the amount of $600,000.00 and for general damages in the amount of $350,000.00. On appeal, Chicago contends that the record does not support the award for diminished earning capacity or that for future medical expenses, and Labruzzo argues that the amounts of these two awards are insufficient.

Diminished Earning Capacity
Labruzzo did not return to his job with BBI following the accident; the Trial Court's award of $600,000.00 compensates Labruzzo for his ten to eleven years of work life expectancy. On appeal, Chicago contends that this amount is excessive because Labruzzo is able to work and in fact has worked since his injury and earned income in excess of that he was earning before the injury. Labruzzo asserts that the award does not include items of proven damages and hence is inadequate.
Because any economic loss Labruzzo has suffered due to the accident will be reflected in the difference between his pre-injury and his post-injury income, the parties' contentions have focused upon the sources and amount of income Labruzzo was earning at the time of the January 1983 accident. The testifying economic experts presented very different findings on the question. Labruzzo's economist included in his base pre-injury income Labruzzo's BBI salary with an annual $12,000.00 bonus and fringe benefits (car allowance, meals, insurance), plus average annual self-employment earnings from the Ramada job of $70,833.00for a total of $149,711.00 per year. In contrast, Chicago's economist found that Labruzzo had a total annual income before the injury of only $35,450.00, the amount of the BBI salary less alimony *521 payments which the economist excluded from income.
It is undisputed that Labruzzo received substantial income from his contracting job for Ramada after the accident. Nevertheless, this element of Labruzzo's income was a point of particular controversy. Labruzzo contends that the income from the Ramada job was deferred payment for work he actually performed before he was injured. The evidence on this point is conflicting. Even assuming the Ramada work was performed before Labruzzo was injured, there is still considerable doubt that the Ramada income should be considered indicative of Labruzzo's pre-injury self-employment earning potential. Chicago contends that the Ramada job was a one-time opportunity for Labruzzo. He presents no concrete evidence of other similar jobs, but argues that, because he got the Ramada job through his position with BBI, loss of the BBI job due to the injury has foreclosed similar opportunities in the future. Moreover, because the self-employment income exceeded the BBI salary Labruzzo had earned before he was injured, Chicago's economist concluded that Labruzzo suffered no economic loss, neither lost income nor diminished earning capacity, as a result of the accident.
The nature and extent of Labruzzo's other post-injury income are also in dispute. In 1983 and 1984, after his injury, Labruzzo continued to receive income from several investments and business ventures in addition to the Ramada contracting job. A portion of this income, however, was produced from property or contracts acquired before the accident. Labruzzo claims that due to the injury, he is unable to accumulate income producing property or to secure substantial contracts for his services, and consequently, his income will decrease. Labruzzo characterizes his work since the accident as sporadic efforts to keep in touch with former associates, mere busy workmore for his mental well-being than for profit.
Chicago contradicts Labruzzo's depiction of his financial situation, relying primarily upon financial statements that Labruzzo filed after his injury in connection with bank loans. In a statement dated September 26, 1984, more than a year and a half after his injury, Labruzzo indicated an annual income of "approximately $125,000.00." Additionally, the financial statements show an increase of more than $800,000.00 in Labruzzo's net worth between January 15, 1983 and February 1, 1985, even after taking into account substantial new liabilities.
In his written Reasons for the $600,000.00 award for Labruzzo's economic losses, the Trial Judge indicated that he was basing the damages upon a pre-injury income composed of only the BBI salary, bonus, and fringe benefits. The Trial Judge stated that the record showed that Labruzzo did "nothing of consequence" after the accident other than work begun earlier. The Reasons further stated that Chicago's evidence of Labruzzo's improved financial condition "ignores [his] inability to work."
Chicago argues that the $600,000.00 award based upon "inability to work" is an abuse of the Trial Court's discretion in light of the evidence of Labruzzo's post-injury work and income. The assessments of losses made by both economists refute this argument. When Labruzzo's economist was asked to calculate his total gross wage loss based upon only the BBI salary and bonus, but assuming post-injury earnings of fifty percent of that base, he arrived a figure of $604,302.60. Chicago's expert gave a similar figure, $636,854.00, for total losses based on the BBI salary without the bonus, and assuming no post-injury earnings. Accordingly, whether Labruzzo had post-injury earnings or not, the damages he was awarded are supported by the evidence and hence not an abuse of the Trial Court's discretion.
Labruzzo appeals the Trial Judge's failure to address as elements of damages either the loss of self-employment income or the loss of property interests which he had anticipated receiving through his association with Burrus and Berger.
The Reasons for Judgment implicitly recognize the substantial self-employment *522 project Labruzzo undertook for the Ramada Hotel. Nevertheless, by not mentioning self-employment income in calculating Labruzzo's damages, we conclude that the Trial Judge found that the Ramada job was a one-time, non-recurring opportunity and not indicative of Labruzzo's pre-injury capacity for self-employment. This finding is not manifestly erroneous.
As for Labruzzo's other alleged element of damages, there was evidence that through the years Labruzzo and other BBI executives had been given property interests as part of their compensation package. On a proffer, Labruzzo presented evidence of the anticipated future value of these interests. Although we believe the Commissioner could have admitted the evidence concerning the value of the property Labruzzo might have acquired had he continued as a BBI employee, we do not find abuse of the Trial Court's discretion in the failure to include its loss as an element of damages. Labruzzo's anticipated receipt of the property interests and their subsequent increase in value are both speculative eventualities and hence well within the Trial Court's discretion to reject as proven fact.

Future Medical Expenses
Labruzzo and Chicago stipulated to pretrial medical expenses of $76,341.21, and because judgment was rendered for that amount, past medical expenses are not an issue on appeal. The $45,000.00 award for future medical expenses, however, is contested by both parties.
We first consider Chicago's contention that Labruzzo's claim for future medical expenses is barred by his settlement with BBI's worker's compensation carrier. North River Insurance Company paid Labruzzo weekly benefits totalling $19,788.00 and medical expenses of $76,341.21. Labruzzo then settled his worker's compensation suit against North River for the sum of $35,000.00, plus payment of medical expenses from April 17, 1985 to April 16, 1986. Chicago argues that recovery in tort for future medicals will result in double recovery for Labruzzo, or alternatively, that the settlement represents an admission by Labruzzo that he has no substantial claim for future medical expenses. Both arguments are refuted by the Worker's Compensation Act.
Section 1101 of the Act provides that the payment of compensation does not affect an injured employee's right to claim damages from a third party tortfeasor. Double recovery by the injured employee for future losses is prevented by La.R.S. 23:1103 and the jurisprudence which provide that the intervening compensation carrier is entitled to a credit for future benefits or medical expenses up to the amount of the tort recovery for these items. Hence, regardless of the worker's compensation settlement, the tortfeasor may be held liable to the injured employee for future expenses; the only possible effect of the settlement is upon the compensation carrier's rights which are not at issue in this case.
Section 1101 of the compensation act negates Chicago's alternative argument. It expressly provides that the payment or award of compensation shall not affect the claim or right of action of the employee against third persons, nor be regarded as establishing a measure of damages for the claim.
Consideration of the assignments of error as to the amount of the award for future medical expenses requires a review of Labruzzo's medical treatment. On the day following his injury, Labruzzo came under the care of Dr. Robert D'Ambrosia, an orthopedist who diagnosed the injury to Labruzzo's left leg as a "smashed down tibial plateau fracture" which was repaired surgically. During Labruzzo's hospital stay recuperating from this surgery, he became very depressed about his physical incapacity. At Dr. D'Ambrosia's suggestion, a psychiatrist began treating Labruzzo. The depression corresponded with Labruzzo's physical condition, and following a period of painful physical therapy in April 1983, his mental condition required hospitalization for several weeks in a psychiatric institution.
*523 Labruzzo continued to have problems with his knee, including a severe infection, osteomyelitis. Consequently, in January of 1984, one year after the accident, Dr. D'Ambrosia performed a total knee replacement. The replacement was not successful, however, and another type of replacement was done in May of 1984. Dr. D'Ambrosia anticipates that Labruzzo will have to undergo at least three more knee replacements in his lifetime, at a total cost of $45,000.00 to $75,000.00 plus the costs of physical therapy after each surgery.
As Labruzzo's recovery from the knee injury progressed, he began to experience back problems. It was Dr. D'Ambrosia's opinion that Labruzzo had injured his back in the accident but that the pain from his knee had initially masked the back injury. A CAT scan, ordered by Dr. D'Ambrosia, showed one herniated disc and two bulging discs in the sacro-lumbar region, a condition consistent with Labruzzo's complaints. Dr. D'Ambrosia said he prefers conservative treatment of disc problems, but in his opinion, future surgery to remove the herniated disc is "more probable than not." He estimated the cost of the back surgery at $15,000.00 to $25,000.00. In contradiction of this evidence, the orthopedic surgeon who testified for Chicago concluded that based upon his examination, Labruzzo did not have a herniated disc. He stated that he found the CAT scan used by Dr. D'Ambrosia technically inadequate for the diagnosis of a herniated disc. It was his opinion that the bulging discs are the result of natural degenerative changes.
The evidence shows that future psychiatric care is very likely for Labruzzo. Two treating psychiatrists testified without contradiction that Labruzzo's injury and disability have greatly affected him because he was a very active person whose psychological well-being depended upon his ability to take care of himself and to meet and overcome challenges. Labruzzo's history of medical treatment for his knee injury has shown that he becomes very depressed each time he is hospitalized or otherwise physically restricted or incapacitated. The pychiatrists testified that this pattern of emotional disturbances will likely continue and that the anticipated future surgeries and periods of convalescence will produce recurring episodes of depression.
In its appeal, Chicago contests the amount of Labruzzo's award for future medical expenses on several grounds. It first contends that Labruzzo's disc problems are not as serious as he claims and that the problems are not related to the accident; therefore, he is not entitled to medical expenses for future treatment. Chicago also contends that the Trial Court misinterpreted Dr. D'Ambrosia's opinions regarding future surgery which it argues are purely speculative and cannot support the award.
In recommending the award of future medical expenses in the amount of $45,000.00 which was adopted by the Trial Judge, the Commissioner's report found only that "at least one other knee replacement will be necessary" and that Labruzzo will need psychiatric treatment in the future. The report indicates that the Commissioner did not accept the evidence that back surgery would probably be necessary.
Given this conservative evaluation of the medical evidence, we reject Chicago's contentions that the $45,000.00 awarded Labruzzo for future medical expenses is excessive. For the most part, Chicago's contentions are based upon alleged errors in determinations made upon varying medical opinions. When there is such a variance in estimated damages, the Trial Court has much discretion in determining the amount to be awarded. Therefore, we find no manifest error in the Trial Court's limited acceptance of the treating orthopedic physician and psychiatrists' opinions and estimates of Labruzzo's future medical expenses.
Neither can we say however that there is merit in Labruzzo's argument that the amount of the award is inadequate. It may be on the low side; the Trial Court rejected much of the medical evidence. Nonetheless, given the great discretion of the Trial Court, we find no manifest error.

*524 NEW TRIAL
Chicago's motion for a new trial was denied without a hearing in the Trial Court, and on appeal Chicago reasserts the grounds for its motion. It first contends that the judgment was contrary to the pretrial settlement because it ordered that interest was to run from date of demand on the total amount of damages, $1,071,341.21, rather than only on $571,341.21, the net amount to be paid by Chicago after application of the stipulated $500,000.00 credit. The settlement provided:
JOHN FRANK LABRUZZO and SUSAN R. LABRUZZO, do hereby specifically acknowledge and agree that EXCESS INSURERS [Chicago] shall not be obligated for any legal interest on the full $500,000.00 policy limits, for which EXCESS INSURERS here and specifically receive a credit, but, EXCESS INSURERS shall only be liable for legal interest, if awarded by the Court, on the amount of any Judgment, if any, which may be rendered, said Judgment having first applied the $500,000.00 credit to which EXCESS INSURERS are entitled.
The judgment stated:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiff John Frank Labruzzo, and against defendant Chicago Insurance Company, in the full sum of One Million Seventy-one Thousand Three Hundred Forty-one and 21/100 ($1,071,341.21) dollars, together with legal interest thereon from date of judicial demand until paid, subject to a stipulated credit in the amount of Five Hundred Thousand and No/100 ($500,000.00) dollars.
The Trial Judge erred when he refused to grant a new trial or otherwise amend the judgment to clearly provide that Chicago is liable for interest only on the amount of the judgment in excess of the stipulated credit. Therefore, we will amend the judgment to so provide.
Chicago's second argument in support of a new trial was based upon alleged new evidence. Chicago presented an affidavit and documents to show that after the close of evidence but prior to judgment Labruzzo had incorporated a construction company which was performing work at the Jax Brewery site. Moreover, Chicago alleged that Labruzzo himself had been seen at the site, actively engaged in construction work. Chicago also alleged that after trial it learned that, contrary to Labruzzo's trial testimony, investment companies in which Labruzzo was a partner had been active in real estate investing in 1984. Newly discovered evidence was also presented to show that one of Labruzzo's psychiatrists who testified at trial was a partner in one of Labruzzo's investment companies.
A new trial shall be granted when the moving party has discovered, since the trial, important evidence which he could not, with due diligence, have obtained before or during trial. La.C.C.P. art. 1972(2). Although the present case is unusual because nearly a year elapsed between trial and the date of judgment, we nonetheless believe that this ground for the granting of a new trial must be limited to evidence which existed at the time of trial. A new trial cannot be granted based upon evidence, such as Chicago presents, of post-trial changes in the injured plaintiff's ability to work or his post-trial business activities, even if those activities contradict trial evidence. See, Burleigh v. State Farm Insurance, 469 So.2d 270 (La.App. 3d Cir.), writ denied 474 So.2d 1305 (La.1985) and Williams v. Liberty Mutual Insurance Co., 327 So.2d 462 (La.App. 3d Cir.1976).
As for Chicago's other new evidence, the information concerning Labruzzo's 1984 real estate investment would not affect the calculation of damages because it does not indicate whether the 1984 investment activity yielded income; and furthermore, the evidence was to some extent merely corroborative because there was evidence at trial that Labruzzo had real estate investments. And finally, in the face of the testimony and medical records presented by other medical experts, the evidence which tends to show bias of the testifying psychiatrist is insufficient to meet the jurisprudential requirement that to support a new trial, newly discovered evidence must be such as would have changed the outcome *525 of the trial. We therefore reject Chicago's contention that the Trial Court erred when it denied the motion for a new trial based on newly discovered evidence.
For the foregoing reasons, we amend the judgment of the Trial Court only as follows:
IT IS ORDERED that there be judgment in favor of John Frank Labruzzo and against Chicago Insurance Company for One Million Seventy-one Thousand, Three Hundred Forty-one Dollars and Twenty-one Cents ($1,071,341.21), subject to a stipulated credit of Five Hundred Thousand Dollars ($500,000.00), with legal interest only on the net amount, Five Hundred Seventy-one Thousand, Three Hundred Forty-one Dollars and Twenty-one Cents ($571,341.21), from date of judicial demand until paid.
Payment of costs and fees are as cast by the Trial Court. Costs of this appeal to be paid by John Labruzzo and Chicago Insurance Company jointly.
AFFIRMED AS AMENDED.
WILLIAMS, J., dissents with reasons.
WILLIAMS, Judge, dissenting.
I respectfully dissent from the decision of the majority.
The most difficult and complex aspect of this case is the question as to whether or not Mr. Labruzzo's exclusive remedy is worker's compensation.
The defendants contend that Mr. Labruzzo was either a statutory employee of JSIL or a borrowed servant. The problem that arises in this particular situation is the fact that JSIL and BBI are closely entwined entities. Darryl Berger and David Burrus are not only the partners in Berger and Burrus Investments, but are also owners with equal shares with Wayne Ducote of the general partnership of Jackson Square Investment Corporation. Obviously, Berger and Burrus are major forces within JSIL. The question that arises when Mr. Burrus is on the premises of Jackson Brewery with his employee, Mr. Labruzzo, is whether or not Mr. Labruzzo's presence is in the course and scope of his employment with BBI, whose payroll he is on, or whether he is also an employee of JSIL for the purposes of determining if worker's compensation is his exclusive remedy as a result of a personal injury on the brewery premises.
The determination is further complicated by the fact that both JSIL and BBI are involved in essentially the same type of activity, that is, real estate development. Although plaintiff contends that the fact that JSIL is involved in long term investments and BBI is involved in short term investments, should be a consideration, this appears to be a distinction without a difference.
When Mr. Labruzzo was on the Jax Brewery property with Mr. Burrus, the controlling factor in determining his status in my opinion is the fact that he was with Mr. Burrus on JSIL property, an entity that Mr. Burrus obviously has a substantial interest in rather than the fact that Mr. Labruzzo was on BBI's payroll.
Therefore, I believe that based upon these facts, Mr. Labruzzo's exclusive remedy would be worker's compensation.