728 So.2d 991 (1999)
Ronda M. ROBBINS, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, Through, the DEPARTMENT OF LABOR, Defendant-Appellant.
No. 31,590-CA
Court of Appeal of Louisiana, Second Circuit.
February 24, 1999.
*993 Henry M. Bernstein, Shreveport, Counsel for Defendant-Appellant.
John W. Wilson, Shreveport, Plaintiffs-Appellees.
Before STEWART, PEATROSS and DREW, JJ.
DREW, J.
The State of Louisiana, Department of Labor, has appealed the judgment in favor of Ronda Robbins for damages sustained in a fall when she tripped on a metal box bolted to the floor when leaving an interview at the Department of Labor office in Shreveport. At issue on appeal is the quantum awarded for various elements of plaintiffs' damages. The State complains that the general damages award of $180,000 is excessive and should be reduced to $150,000. In their answer to the state's appeal, Mrs. Robbins, her husband and her three major children seek increases in general damages, past lost income, future lost income, past medical expenses and future medical expenses for Mrs. Robbins. In addition, Mr. Robbins requests an increase in his loss of consortium and appellees ask that this court assess loss of consortium awards in favor of Mrs. Robbins' three children. The judgment of the trial court is amended and affirmed.
On June 12, 1986, Ronda Robbins had an unemployment interview during which she sat in a side chair next to the employee's desk. When she stood to leave, she tripped over a metal telephone box bolted to the floor under or near her chair. Mrs. Robbins' appointment took place in a large room containing several metal desks each of which had a metal chair by its side for the person being interviewed. The desks and chairs were moved as needed each night by the cleaning crew. A small metal box containing a telephone jack was bolted to the floor near each desk. The box rose several inches from the floor. Acknowledging that he did not tell her about the box, the Labor Department employee thought the box was under or in front of Mrs. Robbins' chair. She injured her knee in the fall and sued the State of Louisiana, Department of Labor. Based upon the evidence presented, the trial court concluded the box created an unreasonable risk of injury to an ordinarily prudent person under normal circumstances and was the legal cause and cause in fact of the accident for which the State of Louisiana was 100% liable. Those findings are not at issue in this appeal.

DISCUSSION
In assessing damages in cases of offenses and quasi-offenses, much discretion is left to the trier of fact. La. C.C. art. 2324.1. Before an appellate court may disturb such an award, the record must clearly reveal that the trial court abused its broad discretion in making the award, based on the facts and circumstances peculiar to the case under consideration. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). Only after an articulated analysis of the facts discloses an abuse of discretion is examination of prior awards in similar cases proper. If the award is abusively low, it is raised to the lowest amount the trier of fact could reasonably have awarded. If the award is abusively high, it is reduced to the highest amount the trier of fact could have awarded. Dixon v. Tillman, 29,483 (La.App.2d Cir.5/7/97), 694 So.2d 585, writ denied, 97-1430 (La.9/19/97), 701 So.2d 174. The proper procedure for examining whether the award is excessive is to determine whether the amount can be supported under the interpretation of the evidence most favorable to the plaintiff which could reasonably have been made by the *994 trier of fact. Likewise, to determine if an award is inadequate, the evidence must be viewed in the light most favorable to the defendant. Graham v. Edwards, 614 So.2d 811 (La.App. 2d Cir.1993), writ denied, 619 So.2d 547 (La.1993).

General Damages
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured exactly in monetary terms. Sallis v. City of Bossier City, 28,483 (La.App.2d Cir.9/25/96), 680 So.2d 1333, writs denied, 96-2592 (La.12/13/96), 692 So.2d 376 96-2599 (La.12/13/96), 692 So.2d 1063. In this action, the state sought a reduction in general damages to $150,000 while the plaintiffs requested that the award be increased to $300,000. The record reveals no abuse of the trial court's broad discretion in making a general damages award of $180,000.00 and we adopt his well-reasoned opinion on this issue as our own.
This accident occurred on June 12, 1986. As Mr. Hillman [Dept. of Labor employee] testified, it was obvious that Ms. Robbins was injured in the fall. Nevertheless, she went home after the accident and tried to relieve her discomfort by resting and taking tylenol. Her knee was badly bruised, sore, and hurting.
On July 18, 1986, Ms. Robbins went to see Dr. Edwin Simonton, a local orthopedic surgeon. After an examination, Dr. Simonton determined that Ms. Robbins had sustained traumatic chondromalacia [abnormal softening of the cartilage on the underside of the knee cap] to the right knee. He injected her knee and continued with conservative treatment during the following months.
By March of 1987, Ms. Robbins' condition had worsened. Dr. Simonton scheduled orthoscopic surgery for March 31, 1987, with the hope of relieving her symptoms. But on March 21, 1987, before the surgery could be performed, Ms. Robbins injured her low back. The injury occurred as her knee "gave out" and she sprained the muscles in her lumbar spine.
On March 31, Dr. Simonton performed the orthoscopic surgery on Ms. Robbins' knee. The surgery was successful, and in the following time Ms. Robbins was able to ambulate with crutches. Her progress was again monitored with conservative treatment. Although there were some minor complications following the surgery, the primary concern was inflammation and weakness in the knee.
By the fall of 1987, Ms. Robbins had fallen again. Her physical activities were restricted by the weakness and discomfort in her knee. She was unable to climb or descend stairs comfortably. Dr. Simonton felt that Ms. Robbins had developed bursitis beneath the patellar tendon which restricted the use of her knee. And in December of 1988, he assigned a 17-1/2 percent permanent partial disability to the right lower extremity. In the following months, Ms. Robbins continued to have the same symptoms intermittently, and eventually developed bursitis in her right hip, secondary to her gait favoring her right knee.
On May 22, 1990, Ms. Robbins saw Dr. Baer Rambach, another local orthopedic surgeon, to get a second opinion about her condition. Dr. Rambach testified that Ms. Robbins had developed some chondromalacia on the right patella. It was his recommendation that she again undergo orthoscopic surgery, which she did on January 16, 1991.
Dr. Rambach followed Ms. Robbins with conservative treatment. He restricted her recreational and work activities to sedentary or semi-sedentary activities. It was his opinion that Ms. Robbins had sustained a 30% permanent partial physical impairment and loss of physical function to the knee.
In 1991, Ms. Robbins moved with her family to Orlando, Florida. On December 17, 1991, she saw Dr. Norton Baker, an orthopedic surgeon in Orlando. She reported continued complaints involving [of] her right knee.
Dr. Baker began a conservative course of treatment which included the use of an immobilizer along with an exercise regime. *995 With continued medication and exercise, Ms. Robbins' complaints resolved to a great extent, and became intermittent. But by October of 1992, not only was Ms. Robbins still complaining of intermittent problems with her knee, she had begun to develop low back pain. Her limping caused back discomfort, and on February 2, 1993, she was again scheduled for orthoscopic surgery of the knee.
Following this surgery, Ms. Robbins continued to experience intermittent back pain. She followed a course of physical therapy and exercises for her knee and back, but by June of 1994, again underwent [for] surgery for realignment of the right patella.
Although Dr. Baker described this procedure as successful, Ms. Robbins continued to complain of discomfort in her knee and her low back. By October of 1994, Dr. Baker ordered an MRI out of concern over the continued complaints and the possibility of degenerative disc disease. The results were negative.
In the following months, Ms. Robbins' condition slowly improved. She continued to have periodic exacerbations of her symptoms. By April of 1995, Dr. Baker decided to do another orthoscopic procedure, and removed a fibrous growth of tissue from the under side of the patella. The growth was found at the same location where the lateral release had been performed by Dr. Rambach. Dr. Baker described Ms. Robbins as recovering fairly well from this procedure, which was followed by intermittent flair-ups to her back.
By July of 1993, with continued conservative treatment, both her back and knee were better. Ms. Robbins had some intermittent pain, but in Dr. Baker's opinion, was doing "exceptionally well." The preponderance of the evidence presented does not establish that Ms. Robbins will require future surgery, other than for the removal of staples.
Regarding work and recreational activity restrictions, Dr. Baker testified that Ms. Robbins should seek employment where she had the ability to alternate between sitting and standing. She should avoid squatting and twisting, as well as repetitive stair climbing, and not carry more than twenty pounds frequently.
Ms. Robbins' two sons, her daughter-in-law, and her husband testified about her physical limitations and her attempts at rehabilitation through exercise.
Based upon the credible evidence accepted by this court, an appropriate general damage award in this instance is $180,000.00.

Past Lost Income
Awards for past lost wages are not susceptible to the great discretion given the factfinder, because past lost income is susceptible to mathematical calculation. Past lost income can be computed on an amount the plaintiff would in all probability have been earning at the time of trial and damages for loss of past income are not necessarily limited to a multiplier of the amount earned at the time of injury. Kessler v. Southmark Corp., 25,941 (La.App.2d Cir.9/21/94), 643 So.2d 345.
The trial court's award to Mrs. Robbins of $6,325 for past lost wages included lost fringe benefits and was based on the court's finding that Mrs. Robbins could have earned at least minimum wage both in the past and in the future. In answering the appeal, plaintiffs contend that the trial court should have awarded Mrs. Robbins $41,867.50 for past lost income. Plaintiffs arrived at that sum by adding $2,280.70 for wages lost at Avis due to injury related absences; $1,684.80 for absences due to knee surgery while working for Transpo in Florida and $37,902.00 calculated by Dr. Milton Harju, plaintiffs' economics expert, as the Transpo wages from the time she left work at Transpo on June 12, 1994, until the trial 2.44 years later on November 21, 1996. Dr. Harju used an hourly rate of $6.10 per hour for the 2.44 year period and added 22.2% benefits to reach the $37,902 figure.
The plaintiffs' sum for lost wages and Dr. Harju's calculation do not include an offset for a minimum wage job. Both the plaintiffs' and the defendant's vocational rehabilitation experts concluded that Mrs. Robbins was able to perform certain minimum wage jobs. *996 Accepted without objections as vocational rehabilitation experts, Dr. Diana L. Herbst for plaintiffs and Dr. Richard Galloway for the defendant, agreed Mrs. Robbins was of low average intelligence. She had left school in the ninth grade. The two experts reached only slightly different conclusions on Mrs. Robbins' performance level in spelling, reading and math which they ranged from third to sixth grade level. Mrs. Robbins began working as a teenager at the McNeal Garment Factory in Shreveport as a sewing machine operator. She later worked as a cashier and manager at Kentucky Fried Chicken. From 1976 to 1985, Mrs. Robbins was employed at ATT. When she was laid off, she worked briefly as a security guard and for a fabric manufacturer. Her employment as a van driver for Avis lasted five years until the family moved to Florida where she worked for Transpo in several capacities: a solderer, a laser machine operator and a packer of auto parts. Both experts relied on medical information that Mrs. Robbins is now limited to sedentary to light work which allows alternate sitting and standing, no heavy lifting, no squatting, no repetitive stooping and no repetitive stair climbing.
Dr. Herbst opined that prior to her fall, Mrs. Robbins was qualified for 9% of the available jobs in the economy. Since the accident, Dr. Herbst estimated Mrs. Robbins was capable of performing from 2% up to 4.5% of the jobs in the economy. The higher figure was based on her ability to use her upper extremities. These jobs were in the service industry at a pay rate of $5.50 to $5.90 per hour. Dr. Galloway estimated that she was available for about 2% of all available jobs and could earn up to $6.50 per hour in jobs such as a dispatcher, a cashier or an electrical assembly line worker. Dr. Galloway acknowledged that her pain and condition put her at a disadvantage in competing for jobs and could also increase the safety risk factor to herself and co-workers.
In awarding past lost wages, the trial court accepted the testimony and calculations of Dr. R. Scott Boaz, the defendant's economic expert. Dr. Boaz made calculations based on the opinions of Dr. Herbst and Dr. Galloway. Dr. Boaz calculated that Mrs. Robbins would have earned $7.22 per hour had she worked continuously at Transpo until trial. Dr. Herbst asserted that Mrs. Robbins had the capacity after the accident to earn $5.90 per hour. Using that figure as an offset, Dr. Boaz computed that Mrs. Robbins' lost wages for the 2.44 years were $8,185. Dr. Boaz then computed the amount to be offset based upon Dr. Galloway's opinion that Mrs. Robbins could have earned $6.50 per hour during the 2.44 year period and arrived at $4,465. Dr. Boaz averaged the two figures and opined that Mrs. Robbins lost $6,325 during the 2.44 year period after she quit work until trial. Based on the facts and circumstances of this case, the trial court was not manifestly erroneous in adopting that calculation and awarding $6,325 in lost wages for the 2.44 year period.
Relative to employment pre-dating the 2.44 years immediately before trial commenced, and admitted into evidence without objection by the state, are documents from both Avis and Transpo, Mrs. Robbins' former employers, concerning time she missed work and pay due to surgery on her knee. Her Avis employer stated he understood her three absences were knee-related. Those dates correspond to the medical evidence. In a trial deposition taken from Transpo's human resource manager, Debbie Wheat identified a letter from the payroll manager showing Mrs. Robbins was out from February 4 to March 27, 1993, on leave of absence. Dr. Baker's release for Mrs. Robbins to return to work is also attached thereto. Based thereon, the plaintiffs have calculated that Mrs. Robbins missed $2,280.70 in lost wages at Avis and $1,299.87 at Transpo. Because we find that plaintiffs have established by a preponderance of the evidence that Mrs. Robbins lost additional wages in the foregoing amounts, the judgment is amended to include an additional $3,965.50 for past lost wages.

Future Lost Income
Since awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, the courts must exercise sound judicial discretion to determine these awards. The awards should be consistent *997 with the record and not work a hardship upon either party. Factors to be considered in determining a proper award for lost future income are the plaintiff's physical condition before the injury, the plaintiffs past work history and consistency thereof, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of her working life. Eppinette v. City of Monroe, 29,366 (La.App.2d Cir.6/20/97), 698 So.2d 658.
Dr. Harju testified Mrs. Robbins was 43.9 years old at the time of trial. Her life expectancy was an additional 37.3 years. Both economics experts made calculations for future lost wages based upon a 10.2 year range and a 16.2 year range. The 10.2 period was the tabular expected work life of Mrs. Robbins at the time of trial. That 10.2 range did not reflect a person's capacity to work but included voluntary absences from the work force.
At trial Dr. Boaz testified that he followed Dr. Harju's present value calculation method. Dr. Boaz calculated that, if Mrs. Robbins were working at trial, she would have been earning $7.22 an hour. As Dr. Harju had, Dr. Boaz used that figure in projections for both 10.5 years and 16.2 years. For the 10.2 years projection, Dr. Boaz concluded her loss would have been $164,505. Since the experts agreed that she could work and earn minimum wage, Dr. Boaz deducted Mrs. Robbins' earning potential by $123,270 or $5.17 per hour for 10.2 years. From the foregoing computation, Dr. Boaz concluded that Mrs. Robbins' future lost income was $41,235, the figure awarded by the trial court. When Dr. Boaz used Dr. Herbst's $5.90 per hour wage, the loss was $25,113; when he calculated based on Dr. Galloway's $6.50 wage, Mrs. Robbins' future lost wages were $16,504.
Dr. Boaz's report demonstrated the same figures calculated the same way for a 16.2 year period. Using Dr. Harju's figure of $233,149 as a start and subtracting a minimum wage salary for 16.2 years, Mrs. Robbins' loss would have been $66,845. If the vocational rehabilitation experts' less conservative estimates of Mrs. Robbins' earning power were used, the projected lost future wages would have been $23,251 (Dr. Galloway's $6.50 per hour wage) or $42,626 (Dr. Herbst's $5.90 per hour wage) for 16.2 years.
Instead of the $41,235 awarded for future lost income, the plaintiffs assert that an award from $122,199 to $209,414.50 should be granted by this court. The plaintiffs objected that the future lost wages should have been based upon the 16.2 year range, that higher wage figures than $7.22 per hour should have been used and that any deductions for minimum wage earnings should have been limited to the assumption that Mrs. Robbins could only have worked a twenty-hour instead of a forty-hour week.
Here the trial court heard economic experts for both sides who used similar methods in calculating damages. The vocational rehabilitation experts for plaintiffs and defendant gave similar testimony and reached similar conclusions. All experts clearly considered Mrs. Robbins' physical condition before and after injury, her work history and the amount Mrs. Robbins would have earned without the injury along with her current earning ability. The trial court also heard the lay witnesses and had access to the uncontradicted medical testimony of her treating physicians. The trial court's conclusion that Mrs. Robbins's future lost wages were $41,235 was within its great discretion in arriving at the inherently speculative award which is incapable of mathematical certainty. While not the most generous of the experts' calculations, the award was within the range of calculations based on the variety of figures available for computation. We find the award to be consistent with the record and not a hardship on any party.

Loss of Consortium
Under La. C.C. art. 2315, damages may include loss of consortium, service and society. Loss of consortium is recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person. Loss of consortium can involve loss of love and affection, loss of society and companionship, impairment of sexual relations, loss of performance of material services, loss of financial *998 support, loss of aid and assistance, and loss of fidelity. To be compensable, it is not necessary for a claim for consortium to include damages from each type of loss. Maranto v. Goodyear Tire & Rubber Co., 25,114 (La.App. 2 Cir. 5/10/95), 661 So.2d 503.
In addition to $180,000 in general damages, the trial court awarded plaintiffs $29,024 for past loss of household services and $59,788 for future loss of household services, or $88,812 for total lost household services. Louisiana law allows, as an element of damages, reasonable housekeeping expenses necessitated by the incapacity of an injured spouse. Maranto v. Goodyear, supra. Mrs. Maranto's husband and children had to take over many of her normal household activities after the accident. In Maranto, Dr. Harju calculated lost household services based upon 20.1 hours per week at $5 per hour for a total of $200,171. This court reduced the award to $25,000 for loss of household services because Mrs. Maranto could and did perform some of the tasks. In this case, the trial court's award for past and future household services was based upon Dr. Harju's calculations for ten hours of household services per week (half the number used in Maranto, supra) times the minimum wage. This generous award is not at issue in this appeal.
The plaintiffs contend that the large lost household services award demonstrates that the loss of consortium award should be increased while the defendant takes the opposite position. Since loss of performance of material services can be an element of lost consortium, this substantial and liberal compensation for lost household services attenuates any need for increase to this award. Mrs. Robbins who has custody and daily care of her four-year-old granddaughter does in fact now perform some of the household services.
The cases cited in brief by plaintiffs do not assist their argument that the consortium award should be increased. While not an enumerated factor in some of the opinions, loss of household services awards was not made separate from a loss of consortium award in any of the cited cases. For example, in Seagers v. Pailet, 95-52 (La.App. 5th Cir.5/10/95), 656 So.2d 700, a factor in the $75,000 loss of consortium award was loss of material services including child care and household services. In Spangler v. North Star Drilling Company, 552 So.2d 673 (La. App. 2d Cir.1989), the husband's inability to garden or chop wood was considered in the $25,000 award. In Delphen v. DOTD, 94-1261 (La.App. 4th Cir.5/24/95), 657 So.2d 328, writs denied, 95-2116, 95-2124 (La.11/17/95), 663 So.2d 716, 717, household services were not a factor in the $50,000 loss of consortium award made to a newlywed wife who cared for her husband during his hospitalization. The couple's sex life was impaired during the first year of marriage, which the court characterized as a critical time in which the marriage was subject to problems. The husband there had seven facial surgeries, TMJ treatment and psychotherapy for depression.
Mrs. Robbins testified at length that her knee pain caused her to be extremely irritable with her family, impeded her ability to take part in some family outings such as motorcycle riding and visits to attractions in the Orlando area, interfered with her sexual relations with her husband, prevented her from performing household and gardening chores and deterred her from recreation she had enjoyed with her husband such as woodworking and attending parties.
Mr. Robbins testified about their enjoyment of riding Harley-Davidsons together for weekend trips prior to her fall. Since she was unable to use the ski rig after her accident, the Robbins family sold their boat. The family also gave up camping trips. Mr. Robbins also testified specifically how his wife's injury interfered with the couples' sexual relationship. While he acknowledged that the frequency of their physical relations was back to the pre-injury level, Mr. Robbins concurred with plaintiff that her knee injury continued to alter that aspect of their marriage. Both stated they had given up on their dream of one day owning a two-story home. Mr. Robbins also described how he cooked and did housework after her injury.
The trial court correctly found that Mr. Robbins was entitled to recover for his loss of consortium. The plaintiffs have been well compensated for their loss of Mrs. Robbins' *999 household services. The trial court's award for loss of consortium or lack of an award is entitled to great deference, since the determination of loss of consortium is a factual finding which is not set aside absent manifest error. Richard v. St. Paul Fire and Marine Ins., 94 2112 (La.App. 1st Cir.6/23/95), 657 So.2d 1087. This $15,000 award is not disturbed because we find the quantum to be within the trial court's great discretion and not manifestly erroneous.
The trial court did not make loss of consortium awards to Mrs. Robbins' three children whom plaintiffs contend should be awarded something for their own loss of consortium. Plaintiffs note that at the time of the June 12, 1986 accident, Shane was 14, Juanita, 12 and Brian, 11. They left home at the ages of 21, 18 and 20, respectively. To support the children's loss of consortium claims, plaintiffs presented trial testimony of Brian, Shane and her daughter-in-law, Jody Brazzell, along with their depositions. There is neither trial nor deposition testimony from her daughter Juanita.
A child cancer patient who was treated at St. Jude, Brian was in remission at the time of his mother's injury and is now apparently in good health. When Mrs. Robbins was not able to accompany Brian to St. Jude's for his check up, Mr. Robbins went. Brian's testimony was that her pain caused her to blow up if he did something wrong. She could not go out or take him out to play and he had to do chores on occasion instead of playing with friends. Specifically, Brian had to clean up inside and help with flower beds outside after his mother's injury. Occasionally in Florida, he missed trips to the beach because he had to stay with his mother who got on his nerves at times because of her irritability. In spite of her crankiness, he, of course, still loved his mother.
Shane testified his sister did all of the dusting after the accident and that there were occasions when they could not go out to play because they had chores to do due to their mother's injury. That led to arguments among them. However, once they were required to do housework, the children received an increased allowance in payment. His mother was so irritable that he left home and lived with his uncle for about a year before the family moved to Florida. Shane stated his mother attended only one of his ball games and also missed his sister's basketball games due to her knee injury.
Separated from Shane three years at the time of her deposition, Jody Brazzell stated she met Mrs. Robbins about a year after the accident when she and Shane started dating. She was eleven and Shane was about fifteen at the time. Jody stated Shane's mother often could not accompany them to places due to her knee pain. When living in the Robbins' home in Florida, Jody did chores and stated that Mrs. Robbins frequently asked her to assist with household tasks Mrs. Robbins undertook. Characterizing Mrs. Robbins as emotional, cranky and moody, Jody stated that the family was very close and assisted Mrs. Robbins. Jody also noted that Mrs. Robbins could not lift or play with her grandchild as much as she and the child wanted.
Plaintiffs seek $35,000 for Brian and $25,000 each for Shane and Juanita. Much of the accident's impact on the children arose out of their being required to assist with household services as teenagers. The plaintiffs have been well compensated for lost household services. However, the children were prejudiced to some extent by their mother's mood swings, crankiness and inability to engage in activities with the children following her accident. The record supports a minimum award for loss of their mother's consortium and the trial court erred in not making those awards. Our review of the record reveals that awards should have been made in the following amounts: $2,000.00 to Shane, $1,000.00 to Juanita and $2,500.00 to Brian. These are reasonable awards under the evidence in this record

Medical Expenses
In brief, plaintiffs contend that the trial court's awards for both past (exceeding $41,000.00) and future medical expenses were inadequate and should be increased. Since plaintiffs arguments are limited to future medical expenses, this court will address only issues related to future medical expenses. Awards for future medical expenses are speculative *1000 and insusceptible of determination with mathematical certainty. However, they must be established, like any other elements of damages, with some degree of certainty. Awards for future medical expenses that may or may not be incurred require medical testimony that they are indicated and their probable costs. Kessler v. Southmark Corp., supra.
The trial court's single award for future medicals, $1,712.00 for future over-the-counter medication, was based upon testimony by Mrs. Robbins and Dr. Harju who explained at trial how he calculated that amount. The plaintiffs argued that the trial court erred in denying recovery for Mrs. Robbins' post-trial January 1997 surgical removal of her staples at a cost of $4,576.55 for the procedure and the medical records therefrom. Additionally, plaintiffs maintained the trial court should have awarded $5,874.75 for future doctor visits, $9,325.00 for future physical therapy, $8,274.25 for future surgery on her knee cap and from $13,500.00 to $18,500.00 for future total knee replacement surgery. The estimates for future office visits and physical therapy were apparently calculated by plaintiffs' counsel based upon past billings in the record.
When questioned at his May 14, 1996 deposition concerning future office visits, Dr. Norton M. Baker, her treating orthopedic surgeon in Florida, stated he wanted to see Mrs. Robbins on an as needed basis. When asked for an estimate, Dr. Baker suggested three to four visits a year based upon the previous year, but the doctor did not know the charge for an average office visit. As to whether Mrs. Robbins would need future physical therapy during her life expectancy, Dr. Baker stated that she might "possiblyif she has a minor little injury or something like that." Dr. Baker reported that Mrs. Robbins's last professional physical rehabilitation was in July 1995, after which she had been exercising on her own.
At that same May 14, 1996 deposition before the November 1996 trial, Dr. Baker foresaw no further surgery for Mrs. Robbins because the previous surgery had good results and was progressing. Although a patellectomy (removing or replacing the knee cap) might be possible, the doctor did not anticipate that need arising. While the previous surgery did not make Mrs. Robbins symptom free, Dr. Baker felt it was successful in stabilizing her knee cap, preventing it from deteriorating and building up her musculature. In a 1994 surgery, Dr. Baker had placed staples in Mrs. Robbins's knee. While the staples are permanent, they could be removed if they caused problems. Dr. Baker stated that Mrs. Robbins had made no specific complaints about that area to him.
During Dr. Baker's May 1996 deposition, plaintiffs' attorney obtained, apparently from Dr. Baker's staff, cost estimates of $8,274.35 for surgical code 27350, which Dr. Baker identified as a patellectomy, and $5,061.00 for surgical code 20680, which Dr. Baker stated was for removal of staples. The doctor gave no testimony about estimated surgery costs. The untitled document containing only the surgery codes and costs is attached to the deposition as Exhibit 10.
To support their contentions that the trial court should have awarded the costs of the post-trial staple removal and future total knee replacement, plaintiffs rely on the deposition testimony of Dr. Craig R. Springmeyer. On January 2, 1997, the state filed a motion to file into evidence the deposition of Dr. Springmeyer which the parties agreed was taken as a trial deposition. The trial court signed an order that same day filing the deposition into the record. The record also contains a January 9, 1997 stipulation that Mrs. Robbins' fall discussed in Dr. Springmeyer's evidentiary deposition referred to an occasion when she was standing on the floor in the bathroom and straightening a picture above the toilet. Her "affected knee gave out causing the knee in the area of the staples to strike the toilet. She did not fall to the ground."
Following an independent medical exam on October 21, 1996, Dr. Springmeyer made a report, attached to the deposition filed into the record, which noted a recent fall and pain over her staples. Although it would not relieve her paratatellar pain, the doctor opined that it would be helpful to remove the staples. Dr. Springmeyer stated he did not anticipate the need for any other surgery. *1001 Dr. Springmeyer had not examined any of Mrs. Robbins' other medical records from any other treating physicians. She had reported to Dr. Springmeyer's nurse that Dr. Baker planned to remove the staples.
Concerning total knee replacement, Dr. Springmeyer stated that "... in her tibia femoral joint she probably could develop arthritis, not necessarily related to her problem, but I think in her patello-femoral joint she will probably develop more pain and possibly arthritis over time which in and of itself may require total knee replacement." Stating he was again not talking about medical certainty, plaintiffs' attorney asked "... but 51-49 would it be your belief that it's more likely or less likely that she will need the total knee replacement during her life expectancy." Dr. Springmeyer answered, "It's probably more likely."
While speculative and insusceptible of precise calculation, future medical expenses, like other elements of damages in civil matters, must be proven by a preponderance of the evidence. Plaintiffs did not sustain that burden and did not establish with some degree of certainty the need for future office visits and future physical therapy. Dr. Baker's deposition testimony belied plaintiffs' assertions that future therapy and office visits were indicated. He only wanted to see Mrs. Robbins on an "as needed" basis and stated she would not require physical therapy unless further injured. The only testimony about total knee replacement is speculative and does not rise to the level establishing that total knee replacement is indicated for Mrs. Robbins.
In its reasons for judgment, the court stated that the preponderance of the evidence did not establish that Mrs. Robbins would require any future surgery, except for the removal of staples. At his deposition, Dr. Baker acknowledged that staples could be removed if they caused problems, but stated he had received no complaints from Mrs. Robbins. Based upon the history provided by Mrs. Robbins, Dr. Springmeyer opined that staple removal would be beneficial and was planned by Dr. Baker. However, this record contains no testimony about the costs for a staple removal procedure. While the trial court recognized the record established the probable need for such a procedure, it properly denied recovery for future staple removal due to lack of evidence of cost, the only indication of which is an untitled, unsigned document attached to Dr. Baker's deposition.
Plaintiffs submitted to the trial court their memorandum in support of the new trial along with a number of exhibits labeled P32-P37, all of which concern the January 1997 staple removal. A letter of transmittal of the memo and exhibits to the trial court dated February 24, 1998, and signed by plaintiffs' attorney, states that the state's attorney had reviewed the exhibits and advised that his client would stipulate that the exhibits were admissible without the necessity of live testimony or further examination. Neither the transmittal letter to the trial court nor the memorandum supporting plaintiffs' motion for new trial and the attachments thereto contains any type of file stamp from the Caddo Clerk of Court. Further, the memo and attachments are not in the record or contained on the index of the contents of the record. The Caddo Clerk of Court has supplied this office with a letter file stamped April 7, 1998, in which the state's attorney informed the trial court that he had received the plaintiffs' memo supporting their motion for new trial.
Instead of a stipulation, the record contains the state's vigorous opposition to the motion for new trial. The state maintains that the plaintiffs' submitted evidence relating to post-trial surgery is a post-trial change or worsening of plaintiffs' condition which does not constitute newly discovered evidence supporting a new trial grant. The state relies upon Labruzzo v. Employers Ins. of Wausau, 521 So.2d 515 (La.App. 4th Cir. 1988), writ denied, 523 So.2d 1342 (La.1988), in which nearly a year elapsed between trial and the date of judgment. The court concluded that the ground for the granting of a new trial must be limited to evidence which existed at the time of trial. A new trial cannot be granted based upon evidence of post-trial changes in the injured plaintiff's ability to work or his post-trial business activities, even if those activities contradict *1002 trial evidence. Here, plaintiffs post-trial surgery took place the same month the trial ended.
An appellate court renders its judgment upon the record on appeal. La. C.C.P. art. 2164. The record on appeal is that which is sent by the trial court to the appellate court and includes the pleadings, court minutes, transcript, jury instructions, judgments and other rulings, unless otherwise designated. La. C.C.P. arts. 2127 and 2128. An appellate court cannot review evidence that is not in the record on appeal and cannot receive new evidence. Unless accepted into evidence by the trial court, the briefs of the parties and the attachments thereto are not part of the record on appeal. Tranum v. Hebert, 581 So.2d 1023 (La.App. 1st Cir. 1991), writ denied, 584 So.2d 1169 (La.1991).
Directing that appellate courts render any judgments that are just, legal and proper on the record on appeal, La. C.C.P. art. 2164 authorizes an appellate court to remand a case when it is just and proper disposition of the case. Herbert v. Travelers Indem. Co. 255 La. 645, 232 So.2d 463 (1970). A 1964 jury verdict in favor of defendants was set aside and a 1968 bench trial resulted in judgment for the plaintiff for his injuries. While on appeal, the defendants sought to have the matter remanded for new evidence, a surveillance film showing plaintiff had no disability. The supreme court granted writs when the appellate court set aside the trial court's judgment and remanded the matter for new evidence without examining the merits. Defendants had made no showing that the evidence could not have been obtained with due diligence before the bench trial. The supreme court reversed the remand. A remand for new evidence must be based upon an examination of the merits and is warranted only when the new evidence is likely to affect the outcome of the case. To remand, the appellate court had to set aside the judgment, a power which should be exercised sparingly. Herbert, supra. In White v. West Carroll Hosp., Inc., 613 So.2d 150 (La. 1992), the supreme court, after examining the merits, concluded a remand for introduction of another trial record was justified, since the new evidence could affect the outcome of a prescription issue.
After examining the merits in this matter, we conclude a remand for the evidence plaintiffs sought to present with their motion for new trial is not warranted. The record contains some evidence suggesting the need for a staple removal procedure but no cost estimate. Plaintiffs have made no showing that the required cost estimate could not have been placed into evidence at the trial.

Denial of Plaintiffs' Motion for a New Trial
Plaintiffs' assertion that the trial court erred in denying their motion for a new trial is without merit. Plaintiffs contend that a new trial should have been granted based upon La. C.C.P. art.1972(2) which directs that a new trial shall be granted when a party discovers after trial important evidence which could not with due diligence have been obtained before or during trial. Because Mrs. Robbins testified she hoped she would not have to have surgery to remove staples from her knee, plaintiffs argue that they could not, with due diligence, have obtained the information and documentation prior to trial about the staple removal procedure she underwent in January 1997.
The evidence concerning the staple removal surgery which plaintiffs did place into evidence at trial belies that assertion. As noted previously, there was enough in the record for the trial court to conclude such a procedure would be likely. The plaintiffs failed to obtain sufficient evidence to establish the cost of that procedure. With due diligence, they could have provided that evidence to the trial court.
Plaintiffs argue that they are entitled to a new trial under La. C.C.P. art.1973 which provides that if good ground exists a new trial may be granted. The trial court's discretion to grant or deny a motion for new trial under this article is great and will not be disturbed on appeal absent an abuse of that discretion. Morehead v. Ford Motor Co., 29,399 (La.App.2d Cir.5/21/97), 694 So.2d 650, writ denied, 97-1865 (La.11/7/97), 703 So.2d 1265. We find no abuse of that great discretion in this matter.

*1003 DECREE

The judgment of the trial court is amended (1) to award loss of consortium of $2,000.00 to Shane Brazzell, $1,000.00 to Juanita Brazzell and $2,500.00 to Brian Brazzell and (2) to award an additional $3,965.50 for past lost wages to the previous $6,325.00 past loss wages award made by the trial court for total past lost wages award of $10,290.50. In all other respects, the judgment is affirmed. The judgment of the trial court is AMENDED AND, AS AMENDED, IS AFFIRMED at the state's cost.