794 So.2d 128 (2001)
Dwight YOUNG and Gloria Harkins Young, Plaintiffs-Appellees,
v.
FIRST NATIONAL BANK OF SHREVEPORT, et al., Defendants-Appellants.
No. 34,214-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 2001.
*133 Cook, Yancey, King & Galloway by Sidney E. Cook, Jr., Bernard S. Johnson, Shreveport, Counsel for Appellants, Aetna Casualty & Surety Company and Standard Fire Insurance Company.
Hicks, Hubley & Marcotte by Samuel M. Hicks, Jr., Lydia M. Rhodes, Shreveport, Counsel for Appellant, Fidelity & Guaranty Ins. Underwriters, Inc.
Lunn, Irion, Salley, Carlisle & Gardner by Ronald E. Raney, Penny N. Nowell, Counsel for Appellants, Fidelity and Casualty Company of New York, Commercial Insurance Company of New York and Phoenix Assurance Company of New York.
Mayer, Smith & Roberts by Deborah S. Baukman, Shreveport, Counsel for Appellant, St. Paul Fire & Marine Insurance Company.
Cooper & Pierson by Mary O. Pierson, Baton Rouge; Plummer & Means by David B. Means, III, Mansfield; Scandurro & Layrisson by Stephen O. Scandurro, New Orleans, Dewey M. Scandurro, Baton Rouge, Counsel for Appellees, Dwight Young, Gloria Harkins, Young, Pam Young King and Charles Dwight Young.
Before NORRIS, WILLIAMS and GASKINS, JJ.
WILLIAMS, Judge.
The defendants, Fidelity & Casualty Company of New York, Commercial Insurance Company of Newark and Phoenix Assurance Company of New York, the St. Paul Insurance Company and Fidelity & Guaranty Insurance Underwriters, Inc. (now St. Paul Insurance Company), appeal a judgment awarding general damages of $1,069,000 each to the plaintiffs, Dwight Young and Gloria Young through her heirs, Charles Young and Pamela Young King. For the following reasons, we reverse in part, amend in part, affirm as amended and render.

FACTS
Jess Loyd was employed as a vice-president of the First National Bank of Shreveport (FNB) and worked in the bank's agricultural loan department for many years. Dwight Young worked in the family dairy business begun by his father, who was a friend of Loyd. In 1966, after Young's father died, the business established a credit relationship with FNB and Loyd. In the early 1970s, Young sold the dairy business and began to raise cattle in a manner known as a "cow-calf" operation, i.e., the rancher owns and breeds the cow, raises the resulting calf until it is weaned, and then sells the calf. In the late 1970s, acting upon Loyd's recommendation, Young decided to change his method of raising cattle to a "rye-grass" operation, in which weaned calves are purchased and fattened on grass during Louisiana's rye-grass season, and then sold to feed lots. Loyd advised Young to purchase calves *134 through Kenneth Wade, whom Loyd identified as FNB's "approved" cattle buyer.
From 1977 to 1979, Young's debt level decreased during the operation of the rye-grass cattle business. Young borrowed money from FNB to buy out the business interests of other family members, increasing his total indebtedness from $27,000 to $248,000. In 1980, again acting upon Loyd's advice, Young decided to retain ownership of his calves through the feedlot stage of production in an attempt to increase profitability, because the price per pound was greater for such "feeder" cattle. FNB financed this feed lot operation and Young's debt increased to over $464,000. Loyd arranged a hedge transaction, required by the bank, to guarantee a certain price for the cattle to protect against possible future market weakness. Young later testified that Loyd made the decisions to select the feed lot that was chosen, the trucking company which transported the cattle and the broker who performed the hedge contract.
During the early 1980s, the beef cattle market became depressed, Young's cattle business was not profitable and his debt further increased due to additional loans obtained from FNB to operate the business and cover losses from the previous years. In 1984, Young sold approximately 169 acres of land to reduce his debt load. The following year, Young limited his business to a cow-calf operation, which was considered less risky, and FNB provided financing for the business. In 1986, Young's banking relationship with Loyd ended when FNB refused to finance another year of the business operation.
In 1987, another FNB customer confronted the bank with information learned from Wade concerning Loyd's self-dealing at the expense of borrowers. At a meeting with Loyd and FNB president Hugh Watson, Wade reported that Loyd had taken kickbacks from commissions paid to Wade for the purchase of cattle for Young and others. Several days later, Loyd admitted to Layne Parnell, a bank officer, that he had "profiteered" from his customers and committed a crime. Loyd subsequently shot and killed himself.
Shortly before Loyd's suicide, Young learned of Loyd's reported receipt of kickbacks and shared profits at the expense of FNB customers. The plaintiffs, Dwight and Gloria Young, filed suit against the succession of Jess Loyd, alleging that his misrepresentations and mismanagement of their business had caused them economic loss. That action was the subject of another case, Cagle v. Loyd, 617 So.2d 592 (La. App. 3rd Cir.1993), which affirmed a judgment awarding plaintiffs damages of $1,069,582 for their financial losses.
The plaintiffs also filed the present petition for general damages against FNB and its insurers, Fidelity Casualty Company of New York, Commercial Insurance Company of Newark and Phoenix Assurance Company of New York, the St. Paul Insurance Company and Fidelity & Guaranty Insurance Underwriters, Inc. (now St. Paul Insurance Company). Dwight Young sought to recover mental anguish damages for his loss of self-esteem, depression and panic disorder resulting from his financial losses. Gloria Young died of coronary artery disease several months before trial. Her children, Charles Young and Pamela Young King, were substituted as parties plaintiff. They alleged that the stress resulting from economic loss caused by Loyd contributed to her heart attack and the failure of their parents' marriage. St. Paul Insurance was FNB's umbrella insurer from 1979 through 1985. Fidelity & Guaranty insured FNB during 1983-1985 and was subsequently acquired by St. Paul Insurance.
*135 After a trial, the jury awarded Dwight Young general damages of $855,200 and assessed him with 20% fault. The jury awarded Gloria Young general damages of $748,300, with 30% fault. Several insurance coverage issues, including the allocation of plaintiffs' damages over the several years of coverage, were referred to the trial judge for post-trial determination. After a hearing, the judge found that there was one occurrence per policy period for Dwight and Gloria Young and that one aggregate amount of insurance coverage would apply per policy period. In addition, the judge increased the general damages amount awarded to each plaintiff to $1,069,000, finding that the jury had improperly deducted the percentage of fault from the damage awards.
Plaintiffs filed a motion for new trial or judgment notwithstanding the verdict (JNOV), asserting that their recovery should not be reduced based on their fault because the damages were caused partly by an intentional tortfeasor. The trial court granted the motion, applying LSA C.C. art. 2323(C) to preclude any reduction of plaintiffs' recovery due to their own fault on the basis that Loyd had committed intentional torts. The defendants appeal the judgment.

DISCUSSION

Negligent Misrepresentation and Fiduciary Duty
The defendants contend the trial court erred in finding that Loyd or the bank acted negligently. Defendants argue that the evidence failed to show that Loyd managed Young's business or made negligent decisions.
LSA-C.C. art. 2315 encompasses an action for negligent misrepresentation. In order for that doctrine to apply, there must be a legal duty on the part of defendant to supply correct information and a breach of that duty must cause damage to plaintiff. Watermeier v. Mansueto, 562 So.2d 920 (La.App. 5th Cir. 1990). Although the creditor-debtor relationship does not normally impose an independent duty of care upon the creditor, that relationship may give rise to such a fiduciary duty in certain circumstances. Trans-Global Alloy v. First Nat'l Bank, 583 So.2d 443 (La.1991).
A court of appeal should not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State Dept. of Transp. & Development, 617 So.2d 880 (La.1993). The task of a reviewing court is to assess whether the fact finder's resolution of conflicting evidence was reasonable in light of the record as a whole. Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511.
In the present case, there was testimony that Loyd had developed a personal friendship with Young, who trusted and relied on Loyd's judgment, and that Loyd had actively participated in business decision-making, which included deciding when to purchase calves, when to sell cattle and to whom, and when to send calves to the feed lot. Based on the testimony presented, the jury could have found that Loyd's relationship with Young was more extensive than the traditional, arms-length interaction of a creditor and debtor. Additionally, the evidence supports a finding that once Loyd assumed responsibility for making management decisions in Young's cattle operation, Loyd owed a duty to fully inform Young about the various transactions conducted and to make decisions in Young's best interest.
However, the testimony showed that Loyd failed to disclose his ownership interest in some of the cattle sold to Young and *136 his financial incentive in the choice of a feed lot where, on at least one occasion, Loyd also kept his own cattle. Young testified that Loyd did not explain the factors involved in the hedge transaction and did not fully explain the market conditions influencing the feed lot cattle operation. Based upon this record, we cannot say that the jury was clearly wrong in finding that Loyd breached his duty to provide Young with accurate information and to act in the best interest of Young's cattle business.
Defendants argue that plaintiffs failed to establish a fiduciary relationship because neither Loyd nor the bank had agreed in writing to act as a fiduciary. LSA R.S. 6:1124 provides that a financial institution or officer shall not be deemed to have a fiduciary duty obligation to its customers unless there is a written agreement under which the financial institution or officer agrees to act in a fiduciary capacity. The legislature provided that Section 1124 was deemed to be clarifying in nature and applicable to prior relationships with financial institutions. Acts 1991, No. 581. However, procedural and interpretive laws will not be applied retroactively when such application would operate to disturb vested rights. Trans-Global Alloy, supra.
Defendants cite Oliver v. Central Bank, 26,932 (La.App.2d Cir.5/10/95), 658 So.2d 1316, to support their position. However, unlike the present situation the borrower in Oliver did not file suit until after the effective date of Section 1124. Additionally, in Oliver this court did not expressly address retroactive application of the statute. Thus, the cited case is not persuasive regarding the issue.
A cause of action in tort is a vested property right. A statute enacted after the acquisition of such a vested property right cannot be retroactively applied so as to divest plaintiffs of their vested right. Faucheaux v. Alton Ochsner Medical Foundation, 470 So.2d 878 (La.1985). Here, the plaintiffs filed suit alleging acts creating a fiduciary duty and a breach thereof prior to enactment of Section 1124. Thus, plaintiffs' cause of action in tort is a vested property right and cannot be divested by a subsequent statute. Consequently, Section 1124 is not applicable to this matter. The assignment of error lacks merit.

Fraud
The defendants contend the trial court erred in finding that plaintiffs were entitled to recover under a theory of fraud. Defendants argue that the evidence did not show that either Loyd or FNB committed fraudulent acts because they did not intend to harm plaintiffs.
Fraud is defined as a misrepresentation or suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss to the other. Fraud may also result from silence or inaction. LSA-C.C. art. 1953.
In the present case, there was testimony that Loyd falsely represented to Young that Kenneth Wade was the bank's "approved" cattle buyer who would make purchases for Young. Wade charged a commission of one dollar per 100 pounds of body weight. Wade testified that Loyd secretly received a percentage of the commissions Young paid for cattle purchases. Loyd sold cattle which he co-owned with Wade to Young at a profit without disclosing his ownership interest. There was also testimony that Loyd sold his own cattle to Young while indicating that they were owned by a third party.
Based on the evidence presented, the jury could reasonably have found that Loyd falsely represented that a specific cattle buyer was approved by the bank and *137 suppressed the truth about his financial interest in the commissions Young paid and in some of the cattle purchased, with the intent to obtain an unfair benefit. Thus, we cannot say the trial court was clearly wrong in finding that Loyd committed fraud.

Causation
We must consider whether Loyd's fraud and negligent misrepresentation were a cause of the plaintiffs' damages. In several assignments of error, the defendants argue that plaintiffs failed to establish that Loyd's acts caused the Youngs' financial losses and emotional harm.
To establish liability, the plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm. Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173. The issue of causation is a factual determination which will not be disturbed on review unless manifestly erroneous. Whitehead v. Kansas City Southern Railway Co., 99-896 (La.App. 3rd Cir.12/22/99), 758 So.2d 211.
In the present case, the evidence shows that Loyd's acts of fraud and misrepresentation caused economic loss to the Youngs. Wade testified that for the cattle he purchased for Young and other bank customers, Loyd's portion of the commission was approximately $1.40 for a 400-pound calf. The plaintiffs' transaction summary indicates that Young purchased 4,691 rye-grass calves through Wade during the relevant time period. Thus, the amount of "kickbacks" Loyd received was approximately $6,000 to $7,000 over the years.
Defendants contend that the payments to Wade of one dollar per 100 pounds of weight reflected his standard commission and would have been paid by Young even if Loyd did not receive any share. However, Wade acknowledged that the typical commission in the area was fifty cents per 100 pounds. Wade stated generally that he performed other services, such as feeding and delivery of cattle, for the additional fifty cents he charged, but that he received only 15 cents of that amount. Despite his statement, Wade did not specify those services which Young received for each separate purchase and stated that Loyd did not perform any extra services for his thirty-five percent share of the commission.
Thus, Wade's testimony suggests that he would not have charged a commission double the prevailing rate if not for Loyd's participation. Loyd's failure to disclose this arrangement deprived Young of the opportunity to choose whether he wanted to pay the higher rate and precluded his use of those funds for some other purpose. Similarly, Loyd's sale of cattle he owned to Young at a profit prevented Young from purchasing directly from the original owner and caused an economic loss.
Defendants also contend that Loyd's decisions did not cause Young's business losses. Young testified that in 1980, he started sending calves to the feed lot at Loyd's recommendation. Young stated that he was not familiar with the process, that he was told by Loyd the feed lot was another avenue to make a better profit, and that they did not discuss the potential risks involved. Loyd selected the feed lot and the transportation company which hauled the cattle.
At trial, Louisiana Commissioner of Agriculture, Bob Odom, was accepted as an expert witness and testified that he believed the feed lots provided a potential for higher profit, but with a greater risk of loss depending on market conditions. Odom opined that the risks of feed lots were only appropriate for those cattle ranchers who were in a financial position to handle a substantial loss. Odom acknowledged *138 his statement in a 1982 state publication, The Louisiana Market Bulletin, that feed lots give Louisiana cattlemen an additional opportunity to market their cattle. Odom testified that after his statement was published, he learned that feed lots could be risky.
The evidence indicates that although sending cattle to a feed lot is an acceptable practice, Loyd's recommendation that Young send cattle to a feed lot in 1980 was not prudent. Shortly before that decision, Young had increased his debt load significantly to buy out other family members' interests in the business. Thus, Loyd knew or should have known that Young was not in a financial position at that time to withstand a substantial loss if market conditions worsened, as subsequently occurred. The testimony stating that on at least one occasion, Loyd's feed bill for his own cattle was later credited by the same feed lot chosen for Young's calves, supports an inference that Loyd's motivation for self-gain at least partly influenced his decision to maintain Young's involvement in the feed lot process despite unfavorable conditions.
In their briefs to this court, the defendants repeatedly assert that the evidence shows that Loyd's decision to send Young's cattle to the feedlot was not negligent, while also contending that Young's business lost money in the feed lots because the market conditions were so poor. Based on the testimony presented, the jury could have found that given the prevailing market conditions, Loyd was negligent in deciding to send Young's cattle to the feedlot and in returning to the feedlot in subsequent years despite previous losses.
The jury heard testimony that Loyd exercised significant decision-making authority in the management of Young's business, that the profit margin was slim in the cattle industry and that the market during this time period was weak due to falling beef prices and increasing costs of feed. Based upon the evidence presented, we cannot say the jury was clearly wrong in finding that Loyd's management decisions, negligent misrepresentation and his fraudulent conduct in many of the business transactions were significant contributing causes of Young's economic losses. The assignments of error lack merit.

Jury Instructions
The defendants contend the trial court erred in refusing to give their requested jury instruction concerning circumstantial evidence. They argue that the verdict was tainted by the court's failure to instruct the jury that circumstantial evidence must exclude all other reasonable explanations but the one relied upon.
After presentation of all the evidence and arguments at trial, the court shall instruct the jurors on the law applicable to the cause submitted to them. LSA C.C.P. art. 1792. Adequate jury instructions are those which provide the correct principles of law for the jury to apply to those issues reasonably raised by the pleadings and evidence. The trial court is not required to give the precise instruction submitted by a litigant, but need only give instructions which properly reflect the applicable law. Wilson v. National Union Fire Ins. Co., 27,702 (La.App.2d Cir.12/6/95), 665 So.2d 1252.
The adequacy of jury instructions must be determined in light of the instruction as a whole. Belle Pass Terminal Inc. v. Jolin, Inc., 92-1544 (La.App. 1st Cir.3/11/94), 634 So.2d 466, writ denied, 94-0906 (La.6/17/94), 638 So.2d 1094. A jury verdict will not be set aside because of an incorrect jury instruction absent a showing of prejudice such that the jury was misled and was unable to render a *139 just verdict. Roger v. Dufrene, 97-1946 (La.App. 4th Cir.9/9/98), 718 So.2d 592. Appellate courts exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Wilson, supra.
Here, the trial court instructed the jury that plaintiffs were required to prove each element of their case by a preponderance of the evidence, and properly defined circumstantial evidence as proof of certain circumstances from which one may infer that another fact is true. The court also instructed the jury that in order to prevail, the plaintiffs were required to establish by a preponderance of evidence that their injuries were caused by the defendant's conduct, and if the jury found that plaintiffs' damages resulted from an independent cause, the jury must conclude that the injuries were not caused by defendants.
We find that the foregoing instructions adequately expressed the applicable law and informed the jury of plaintiffs' burden of proving that Loyd's conduct was more probably than not a cause of their damages. The defendants have not shown that the jury was misled by the instructions. Considering the jury instructions as a whole, we cannot say the trial court erred in refusing to give the requested instruction. The assignments of error lack merit.

Jury Interrogatories
The defendants argue that under the circumstances of this case, the trial court's failure to include separate interrogatories for the issues of liability and causation was confusing to the jury and prejudicial. The court may require a jury to return a verdict in the form of a special written finding upon each issue of fact. LSA C.C.P. art. 1812(A). While it may be the better practice to submit a separate interrogatory on each factual issue, the matter is within the trial court's broad discretion. Smith v. Lincoln General Hospital, 27,133 (La.App.2d Cir.6/21/95), 658 So.2d 256, writ denied, 95-1808 (La.10/27/95), 662 So.2d 3.
Here, the verdict form included interrogatory number four, which asked the jury whether defendants "committed acts of negligent misrepresentation and, if so, was such negligent misrepresentation a legal cause of damage?" Interrogatory number five asked the jury whether defendants "committed acts of fraud and, if so, were those acts a legal cause of damage?" The interrogatories generally followed the statutory language.
In addition, as previously noted, the trial court instructed the jury that plaintiffs were required to establish that their injuries were caused by Loyd's conduct. The defendants have not shown that the jury was confused by the interrogatories. Thus, defendants did not establish that the jury verdict form was prejudicial. Consequently, we cannot say the trial court abused its discretion in refusing to submit the separate interrogatories requested by the defendants.

Mitigation of Damages
The defendants also contend the trial court erred in declining to include on the jury verdict form interrogatories concerning the doctrines of mitigation of damages and avoidable consequences. The trial court is vested with broad discretion in determining whether to submit special interrogatories to the jury and in framing the questions to be posed. Appellate courts will not set aside such determinations absent an abuse of that discretion. Tramontin v. Glass, 95-744 (La.App. 5th Cir.1/30/96), 668 So.2d 1252.
In the present case, the trial court instructed the jury that plaintiffs were *140 "obligated to exercise ... ordinary care in order to minimize their damages after the initial injury has been inflicted. The doctrine of mitigation of damages imposes a duty upon an injured person to make reasonable efforts to minimize his damages." The court further instructed the jury that plaintiffs' claims for damages must be measured by the principle of "avoidable consequences," explaining that if the jury found that plaintiffs, after sustaining initial damages, "could have reasonably avoided sustaining further damages by taking reasonable steps, you must reject the claims for additional damages."
The trial court declined to include interrogatories for mitigation and avoidable consequences on the verdict form, finding that they were not necessary in light of the foregoing jury instructions and that those inquiries would not assist the court in addressing the insurance coverage questions. Considering the jury instructions and interrogatories as a whole, we cannot say the trial court abused its discretion in refusing to submit the requested interrogatories.

Prescription
The defendants contend the trial court erred in finding that plaintiffs' claims had not prescribed. Defendants argue that the plaintiffs knew the basis for their cause of action more than one year prior to filing suit.
The one-year prescriptive period does not begin to run until the tort victim discovers or should have discovered the facts upon which his cause of action is based. Constructive knowledge sufficient to commence the running of prescription requires more than a mere apprehension that something might be wrong. In re Medical Review Panel of Howard, 573 So.2d 472 (La.1991).
In the present case, the plaintiffs were aware of their financial situation and of Loyd's role in making business decisions. However, the testimony indicated that Young relied on Loyd's reputed expertise and on his representations that the business losses were solely the result of unfavorable market conditions. In addition, Loyd failed to disclose to plaintiffs his financial interest in the cattle purchases and the choice of a feed lot. Based on the evidence, the jury reasonably could have found that prior to April 1987, plaintiffs did not have reason to know of Loyd's misrepresentations, or that some of his business decisions resulting in economic loss were not based on their best interest, but were made with the motive to benefit himself. Consequently, we cannot say the jury was clearly wrong in finding that plaintiffs' suit was filed timely. The assignment of error lacks merit.

Course and Scope of Employment
The defendants contend the trial court erred in granting a directed verdict concerning the issue of whether Loyd acted within the course and scope of his employment. Defendants argue that Loyd's management of Young's business and his self-dealing were outside the scope of his employment.
A motion for directed verdict is properly granted in a jury trial when, after considering all of the evidentiary inferences in a light most favorable to the mover's opponent, the facts and inferences point so strongly in favor of the mover that reasonable jurors could not reach a contrary conclusion. LSA C.C.P. art. 1810; Moore v. Aetna Casualty and Surety Co., 454 So.2d 1273 (La.App. 2d Cir.1984). The trial judge has much discretion in deciding whether to grant a motion for a directed verdict. Barnes v. Thames, 578 So.2d 1155 (La.App. 1st Cir.1991).
*141 An employer is liable for a tort committed by his employee if, at the time, the worker was acting within the course and scope of his employment. Orgeron v. McDonald, 93-1353 (La.7/5/94), 639 So.2d 224. The course of employment test refers to time and place. The scope of employment test examines the employment-related risk of injury. Baumeister v. Plunkett, 95-2270 (La.5/21/96), 673 So.2d 994. In order for an employer to be vicariously liable for the torts of its employee, the conduct must be so closely connected in time, place and causation to his employment duties so as to be regarded as a risk of harm fairly attributable to the employer's business. Barto v. Franchise Enterprises, Inc., 588 So.2d 1353 (La.App. 2d Cir.1991).
The fact that the predominant motive of the worker is to benefit himself or a third party does not prevent the act from being within the scope of employment. If the purpose of serving the employer's business actuates the employee to any appreciable extent, the employer is subject to liability if the act is otherwise within the service. Ermert v. Hartford Insurance Co., 559 So.2d 467 (La.1990). The scope of risks attributable to an employer increases with the amount of authority and freedom of action granted to the employee in performing his assigned tasks. Ermert, supra.
In the present case, defendants argue that although Loyd was engaged in generating loans for the bank, he went beyond the scope of his employment when he acted to control Young's business operations and that the bank did not benefit from such conduct. However, the evidence presented supports a finding that Loyd's participation in Young's business operation was reasonably incidental to his job duties.
The initial decision by Loyd and the bank to loan money to Young involved knowledge and evaluation of his business assets and liabilities. Thereafter, the economic performance of Young's cattle business became a factor considered by Loyd and the bank in making subsequent loans to plaintiffs. Testimony established that Loyd was a bank vice-president who was given considerable autonomy in carrying out his duties. The bank was aware that Loyd, as an agricultural loan officer, often traveled into the field to meet with customers, monitor their business operations and respond to their financing needs.
Considering the foregoing evidence, we conclude that the risk that Loyd would become too closely involved with Young's business activities or engage in self-dealing was reasonably foreseeable by the bank. The evidence indicated that Loyd's predominant motive in taking kickbacks or making business decisions for Young was to benefit himself. However, the testimony showed that Loyd's contacts with Young were closely related to his employment duties of reviewing the expenditure of loan proceeds, assessing Young's need for additional funds and generating subsequent loans, which created revenue for the bank. Thus, the trial court reasonably could have found that the purpose of serving the bank's interests actuated Loyd to an appreciable extent.
Based upon this record, and considering the evidence in the light most favorable to defendants, we cannot say the trial court abused its discretion in granting a directed verdict concluding that Loyd was acting in the course and scope of his employment at the time of his tortious conduct. Consequently, the bank was vicariously liable for any of the plaintiffs' damages caused thereby. The assignment of error lacks merit.

*142 Evidentiary Issues

The defendants contend the trial court erred in allowing plaintiffs to question a witness, Don Updegraf, concerning portions of an affidavit which he had signed in connection with other litigation and in excluding the entire affidavit from evidence. Defendants argue that the testimony regarding the affidavit was not admissible because it contained statements which were not based on personal knowledge of the witness and was prejudicial to the defendants.
All relevant evidence is admissible unless otherwise provided by law. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury. LSA-C.E. arts. 401-403. Generally, the trial court is accorded discretion concerning the admission or exclusion of evidence. A trial court's decision to admit or exclude evidence will not be reversed absent an abuse of discretion. Dixon v. Winn Dixie Louisiana, Inc., 93-1627 (La. App. 4th Cir.5/17/94), 638 So.2d 306. Extrinsic evidence, including prior inconsistent statements, is admissible when offered solely to impeach the credibility of a witness unless the court determines that the probative value of the evidence is substantially outweighed by the risks of confusion of the issues or unfair prejudice. LSA-C.E. art. 607.
Here, Updegraf stated at trial that as he then understood the term, Loyd was not acting in the course and scope of his employment when taking kickbacks or making business decisions for Young. This testimony contradicted the statement in an affidavit previously signed by Updegraf in connection with the bank's claim for reimbursement from its bond carrier. Plaintiffs' counsel then asked Updegraf about the circumstances of his signing the affidavit and about the document's description of the conduct which was considered within the course and scope of Loyd's employment.
Based upon the references to the prior bond settlement, the defendants sought to introduce evidence that the bank received payment as reimbursement for losses sustained in forgiving the indebtedness of plaintiffs and that the Youngs had also received settlement proceeds. The trial court denied the request, pointing out that the jury had already been informed that plaintiffs' economic losses had been compensated and their debts forgiven. The court decided that evidence of other payments received by plaintiffs and of other proceedings would confuse the jury. Based upon this record, we cannot say the trial court abused its discretion in excluding the evidence.
The defendants contend the court erred in allowing the witness to be impeached on the basis of a legal conclusion contained in his affidavit. However, as we previously noted, during his testimony Updegraf stated the legal conclusion that Loyd had not acted in the course and scope of his employment when taking kickbacks or managing Young's business. In addition, as previously discussed, the evidence in the record supports the finding that Loyd was acting in the course and scope of his employment during his tortious activity, without consideration of the affidavit. Thus, the defendants have not shown that they were unfairly prejudiced by questions regarding the affidavit. Consequently, we cannot say the trial court abused its discretion in admitting the testimony for the purpose of impeachment.
The defendants also contend the trial court erred in precluding questioning of Pamela King regarding the sworn descriptive list filed in her mother's succession *143 stating a value for Gloria Young's claim in this action. Defendants argue that the estimated value in the document was relevant to the plaintiffs' claim for financial worries.
The trial court found that the evidence of the nominal value placed on Gloria Young's claim in the sworn descriptive list would be misleading to the jury and would require the admission of additional evidence concerning succession values that could confuse the issues. The trial court reasonably considered these factors in making its decision to exclude the testimony. Based upon this record, we cannot say the trial court abused its discretion in excluding the evidence. The assignments of error lack merit.

Emotional Distress Damages
The defendants contend the trial court erred in overruling the peremptory exception of no cause of action for mental anguish damages arising out of pecuniary loss. Defendants argue that plaintiffs cannot recover damages for emotional distress under the policies because they did not sustain physical injuries.
An insurance policy is a contract between the parties and should be construed using general rules of contract interpretation. The policy should be construed as a whole, and one provision should be considered in light of the others. Crabtree v. State Farm Insurance Co., 93-0509 (La.2/28/94), 632 So.2d 736. An individual's mental health is an essential component to the overall function of the physical structure of the body. There is no bright-line distinction between physical and "mental" injuries, either in medicine or in law. Crabtree, supra.
Here, the insurance policies issued by defendants provided that the insurer would pay "all sums which the insured shall become legally obligated to pay as damages because of bodily injury" or property damage. Bodily injury was defined as "bodily injury, sickness or disease sustained by any person" that occurs during the policy period. This court has previously concluded that a definition of bodily injury incorporating "sickness or disease" must include mental distress which persists over a period of time and necessitates the taking of medication. See Holcomb v. Kincaid, 406 So.2d 646 (La. App. 2d Cir.1981). In Crabtree, the supreme court also found that a definition of bodily injury, using similar language as above, included severe mental pain and anguish.
The plaintiffs alleged that Loyd's acts resulted in business losses which caused Young emotional distress and contributed to his panic attacks, and that he continues to take medication for the disorder. They also alleged that stress from financial losses was a factor affecting Gloria Young's high blood pressure and heart condition. Thus, the record supports a finding that the definition of bodily injury in the insurance policies provides coverage for the mental anguish alleged by plaintiffs. Consequently, we cannot say the trial court erred in overruling the exception of no cause of action. The assignment of error lacks merit.
The defendants also argue that plaintiffs cannot recover emotional distress damages because they did not prove the existence of a contract which was intended to gratify a non-pecuniary interest. Defendants cite LSA-C.C. art.1998 and Jolley v. Welch, 904 F.2d 988 (5th Cir.1990), in support of their argument. However, the Jolley case involved a claim for emotional distress damages arising from a breach of contract, whereas the present case is an action in tort. Thus, the authority relied upon by the defendants does not support their argument. *144 The assignment of error lacks merit.

Quantum
The defendants contend the trial court erred in increasing the jury's general damage awards of $855,200 to Dwight Young and $748,300 to Gloria Young to $1,069,000 each. Defendants argue that the evidence does not support any general damage award, or alternatively, that the awards are excessive and should be significantly reduced.
General damages involve mental or physical pain and suffering, inconvenience, loss of intellectual or physical enjoyment or other losses of lifestyle that cannot be definitively measured in monetary terms. Robbins v. State Dept. of Labor, 31,590 (La.App.2d Cir.2/24/99), 728 So.2d 991. Before an appellate court may disturb such an award, the record must clearly show that the factfinder abused its broad discretion in making the award. Robbins, supra. The finding of an abuse of much discretion must be based on the particular injuries sustained and their effect on the particular injured person. After a determination that an award constitutes such an abuse of discretion, the appellate court may reduce or increase the award to the highest or lowest amount reasonably within the factfinder's discretion. Wilson, supra.
In the present case, Dr. George Seiden, a board certified psychiatrist, testified that he began treating Dwight Young in March 1984. Dr. Seiden stated that Young experienced his first panic attack in 1981, at a time when he was taking diet pills and drinking alcohol. Dr. Seiden explained that panic attacks involve a sudden onset of anxiety with a feeling of impending doom and are associated with physical symptoms such as dizziness, heart palpitations, nausea and difficulty in breathing.
Dr. Seiden testified that Young indicated his panic attacks began after a bad financial year in the cattle business. Dr. Seiden diagnosed Young as having agoraphobia with panic attacks and prescribed Tofranil, an anti-depressant, to stop the panic symptoms. In his notes of May 24, 1984, Dr. Seiden stated that Young was improving and that he expressed "feeling relief" after having sold land to pay off some debt. Young's last visit in 1984 was in June and Dr. Seiden did not see Young again until January 1990, over five years later.
Dr. Seiden opined that stress over financial difficulty was a significant contributing cause of Young's panic attacks, which were successfully controlled with medication. Dr. Seiden testified that Young's conflict with his wife, her alcohol use and the death of their daughter also would have been contributing sources of stress. At the 1990 visit, Young reported that during the intervening years, he had been divorced, discovered that his banker had misled him and won a lawsuit which improved his financial position. The January 1990 visit was precipitated by Young's anxiety over problems in a relationship with a woman. Dr. Seiden testified that panic disorder is a chronic, recurring condition and the prognosis was that Young would continue to need anti-depressant medication for an indefinite period in the future.
Dr. Donald Taylor, a family practitioner, was a personal friend of Dwight and Gloria Young and had treated them for many years. Dr. Taylor testified that he had treated Dwight Young for hypertension, or elevated blood pressure, since 1968. Dr. Taylor stated that from 1979 to 1981, he also treated Dwight for anxiety and that the patient had reported his sources of stress as marital problems and financial difficulty in the cattle business.
*145 Dr. Taylor testified that Gloria Young developed coronary artery disease in approximately 1981. Taylor stated that Gloria was a diabetic with high blood pressure, was a heavy smoker and was overweight and that she suffered a heart attack in November 1984, several months after her daughter's unexpected death. Dr. Taylor opined that stress was a factor in Gloria's heart disease process, that she experienced anxiety but to a lesser extent than Dwight, and that her stress was mainly caused by conflict with her husband. Dr. Taylor testified that Gloria never complained to him about financial problems. Dr. Taylor stated that prior to her heart attack, Gloria had not been taking her blood pressure medication regularly.
Charles Young and Pamela Young King each testified that their parents' arguments about financial matters contributed to their marital conflict. Charles stated that after the panic attacks, his father did not seem as mentally sharp as before and that he was less able to make decisions. Charles testified that after his mother's heart attack, her health continued to decline until her death. Pamela testified that after her father's first panic attack, he was less confident and his self-esteem was lower. She stated that her mother felt stress from maintaining the house, caring for Dwight and keeping the books of the business. Both children testified that the sale of family land in 1984 was "devastating" to their parents. However, Dr. Seiden's medical reports indicate that at the time, Dwight Young expressed feeling relief after selling that land to reduce his debt burden.
Dr. Paul Ware, a board certified psychiatrist, testified that he performed a psychiatric evaluation of Dwight Young in February 1999, and interviewed him for one and one-half hours. Dr. Ware diagnosed Young as having panic disorder with agoraphobia. Dr. Ware noted that Young's panic attacks were controlled within a few months after Dr. Seiden diagnosed the condition and prescribed an anti-depressant, and that Young did not have any other attacks while taking the medication. Ware acknowledged that stress is a factor in panic disorder, but explained that a patient can have panic attacks even without stress unless he is medicated. Dr. Ware opined that in the early 1980s, Young's primary stressor was his marital difficulty, since Young did not mention stress from the cattle business as a problem during his marital counseling with Dr. Robert Rausch in 1982.
Dwight Young testified that after his first panic attack he began to limit his driving and avoided crowds. He continued to have panic attacks periodically over the next three years until he saw Dr. Seiden in 1984. Young stated that Dr. Seiden prescribed Tofranil and that with the medication he did not have another severe panic attack. Young acknowledged that he stopped seeing Dr. Seiden after three months and did not return for five years because he was "getting along fairly well" and was able to function normally. Young testified that stress from his increasing debt caused him to argue with his wife and they eventually divorced. Young stated that he is currently taking Prozac, an anti-depressant, and verapamil for blood pressure and that his monthly medication cost is approximately $350.
Louisiana courts have found that a plaintiff may recover damages for unintentional or negligent infliction of genuine and serious emotional distress. Moresi v. Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990); Beis v. Bowers, 94-0178 (La.App. 4th Cir.1/19/95), 649 So.2d 1094. A factor in determining the extent of emotional distress is the duration of the condition. Young testified that an *146 increasing debt amount caused him anxiety. However, there was evidence that the business debt decreased from 1977 to 1979, so that Young's stress from debt should have been reduced during those two years. In addition, the record shows that Young's debt level fluctuated widely over the years and increased significantly between October 1984 and September 1985, before dropping again. Thus, the evidence indicates that Young's stress from increased debt was not a constant condition, but would have varied over time.
Dr. Taylor's testimony indicated that stress was a factor in Gloria Young's disease process, but could not attribute such stress to any expressed concern about finances. The evidence showed that other significant sources of her stress included marital conflict, the death of her daughter and serious health problems. Gloria did not seek any psychological treatment for anxiety. In light of the particular circumstances of Gloria's health and the medical and lay testimony, we must conclude that the evidence presented does not support a finding that Gloria Young sustained the requisite level of severe emotional distress as a result of economic losses caused by Loyd's acts. Consequently, the trial court abused its discretion in awarding general damages to Gloria Young and that award shall be reversed.
The record shows that Dwight Young saw Dr. Seiden six times in a three-month period. Following his visit in June 1984, Young did not require any further psychiatric treatment or psychological counseling for his panic disorder, other than drug maintenance. Dr. Seiden and Dr. Ware agreed that Young will most likely require medication to control his panic disorder for the indefinite future.
Dr. Seiden opined that financial difficulty in the cattle business was a contributing cause of Young's panic attacks, which he experienced intermittently during a three year period. However, the evidence established that Young's panic attacks were successfully controlled within a relatively brief period of three months after Dr. Seiden prescribed an anti-depressant medication. Additionally, Young's agoraphobic symptoms were completely relieved by the treatment for the panic disorder.
Based upon the medical evidence, we cannot say the jury was clearly wrong in finding that stress from the financial losses was a significant contributory cause of Young's panic disorder, and that this condition represented severe emotional distress. However, after reviewing the record and considering the duration of Young's treatment with Dr. Seiden and the extent of the particular harm to this plaintiff, we are constrained to find that the trial court abused its broad discretion in the award of excessive general damages to Dwight Young.
Considering the particular circumstances of this case, Young's specific injury and the awards in other cases cited by the parties, we conclude that the highest amount which the factfinder could have reasonably awarded Dwight Young in general damages is $75,000. We shall amend the judgment accordingly.

Allocation of Fault
The defendants contend the trial court erred in granting the plaintiffs' motion for new trial or judgment notwithstanding the verdict (JNOV) and in applying LSA-C.C. art. 2323(C) retroactively. Defendants argue that the damage award should be reduced by the degree of fault assessed by the jury.
If a person suffers injury or loss partly as a result of his own negligence and of the fault of an intentional tortfeasor, his claim for recovery of damages shall not be reduced. LSA-C.C. art. *147 2323(C). Motions for JNOV are governed by LSA-C.C.P. art. 1811. A JNOV is warranted when the facts and inferences point so strongly in favor of one party that the court believes reasonable persons could not arrive at a contrary verdict, not merely when there is a preponderance of evidence for the mover. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); May v. Jones, 28,106 (La. App.2d Cir.5/8/96), 675 So.2d 275.
Here, the jury's damage awards to Dwight and Gloria Young were increased by the trial court to $1,069,000 each. In the judgment, the trial court reduced the awards to reflect the jury's allocation of fault to each plaintiff. Subsequently, the trial judge granted the plaintiffs' motion for JNOV and reinstated the damage awards of $1,069,000 to each plaintiff, finding that their recovery was not subject to reduction for their respective negligence pursuant to Article 2323(C).
The supreme court has found that the 1996 legislative amendment of LSA C.C. art. 2323 concerning quantifying employer fault was procedural and that those provisions could be applied retroactively. Keith v. U.S. Fidelity & Guaranty Co., 96-2075 (La.5/9/97), 694 So.2d 180. This court has previously noted that enactment of Article 2323(C) codified the prevailing rule of law that comparative fault is not applicable to reduce the recovery of damages by a negligent plaintiff who has been injured partly as a result of the fault of an intentional tortfeasor. Babb v. Boney, 30,443 (La.App.2d Cir.4/8/98), 710 So.2d 1132; Hebert v. First Guaranty Bank, 493 So.2d 150 (La.App. 1st Cir.1986).
The jury found that plaintiffs were damaged partly as a result of Loyd's intentional torts. After reviewing the jurisprudence, we cannot say the trial court erred in concluding that pursuant to Article 2323(C), Dwight Young's damage award was not subject to reduction based on the percentage of negligence attributed to him by the jury. The assignments of error lack merit.
The defendants argue that the damage award should be reduced by the allocation of fault because the plaintiffs failed to object to the jury instructions. We note that the jury could have found that defendants were liable only for negligence and not for an intentional tort. In such a situation, comparative fault would have been applicable. Following the jury's finding that Loyd committed an intentional tort, plaintiffs filed a timely motion to preclude reduction of the damage award. The assignment of error lacks merit.
Defendants argue the trial court erred in entering judgment against them for pre 1980 damages because plaintiffs were contributorily negligent. Defendants have the burden to establish contributory negligence as a defense. Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co. Inc., 525 So.2d 1157 (La.App. 3rd Cir. 1988). The general rule in Louisiana was that contributory negligence was not a defense to an intentional tort. South Texas Lloyds v. Jones, 273 So.2d 853 (La.App. 2d Cir.1973). Based on the jury's finding noted above, the defendants' argument lacks merit.
Defendants also argue that Article 2323(C) should not apply to occurrences prior to Loyd's death because the bank did not act intentionally. However, as previously discussed, the bank is vicariously liable for Loyd's acts of fraud. The assignment of error lacks merit.
In its brief, St. Paul Insurance contends the trial court erred in finding that an aggregate liability limit, rather than the policy limit per occurrence, was applicable to the coverage provided by the primary insurance policies. We do not address this *148 issue, since the record reflects that the general damage amount awarded in this opinion would not exceed either liability limit. Thus, the evidence does not show any exhaustion of the coverage provided in the primary insurance policies. Consequently, we shall dismiss all claims against St. Paul Insurance.

CONCLUSION
For the foregoing reasons, that part of the trial court's judgment awarding general damages to the heirs of Gloria Young is reversed. The judgment is hereby amended to reduce Dwight Young's general damage award to the amount of $75,000, with legal interest from the date of judicial demand until paid and retaining the same allocation of damages for each policy coverage period as determined by the trial court. In addition, all claims against St. Paul Insurance Company are hereby dismissed. The judgment is otherwise affirmed. Costs of this appeal are assessed to the appellants, Fidelity & Casualty Company of New York, Commercial Insurance Company of Newark and Phoenix Assurance Company of New York, the St. Paul Insurance Company and Fidelity & Guaranty Insurance Underwriters, Inc. (now St. Paul Insurance Company).
REVERSED IN PART; AMENDED IN PART AND AFFIRMED AS AMENDED; RENDERED.